

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

RICHARD SHORE, M.D., )
)
       **Appellant,** )
)
**v.** )  **WD78530**
)
)  **OPINION FILED:**
)  **December 22, 2015**
THE CHILDREN'S MERCY HOSPITAL )
and DR. GERALD WOODS, )
)
       **Respondents.** )

**Appeal from the Circuit Court of Jackson County, Missouri**
**The Honorable J. Dale Youngs, Judge**

**Before Division II:** Mark D. Pfeiffer, Presiding Judge, and
Lisa White Hardwick and James Edward Welsh, Judges

Dr. Richard Shore ("Dr. Shore") appeals the grant of summary judgment of the Circuit Court of Jackson County, Missouri ("trial court"), in favor of his former employer, The Children's Mercy Hospital ("Children's Mercy"), and his former supervisor, Dr. Gerald Woods ("Dr. Woods"), on his claims for racial discrimination and retaliation pursuant to the Missouri Human Rights Act ("MHRA"), sections 213.055 and 213.070, RSMo 2000. We affirm.

**Factual and Procedural Background[1]**

Children's Mercy hired Dr. Shore (Caucasian male) on October 31, 2005, to work in its Hematology/Oncology ("Hem/Onc") Division. Dr. Shore's immediate supervisor was Dr. Woods (African-American male), who offered Dr. Shore the job.

In the years following Dr. Shore's hire, Dr. Woods invited Dr. Shore to his house to play tennis, invited Dr. Shore to join his fantasy football league, invited Dr. Shore and his wife to attend a social event with Dr. Woods and other Children's Mercy staff members, and went bowling with Dr. Shore. Dr. Shore agreed that during this time, he and Dr. Woods had become "friends," or were at least "friendly" with one another.

In April 2010, a lack of office space made it necessary for several of the Hem/Onc doctors to move their offices from the main hospital building to a mobile office unit across the street. Dr. Woods asked Dr. Shore to make the move with several other doctors and to serve as a mentor to the other, more junior, doctors who were moving. Dr. Shore was upset about the move, asked Dr. Woods to reconsider, and complained repeatedly over several months to Dr. Woods until Dr. Woods relented. In October 2010, Dr. Woods offered Dr. Shore the use of an office back inside the main hospital building when he was working in the main hospital building. Dr. Shore considered this a small but significant gesture of friendship by Dr. Woods. During this same meeting, Dr. Woods confided to Dr. Shore that he was disappointed with the attitudes of many of the Hem/Onc doctors toward patients receiving treatment at the hospital for sickle-cell anemia.

---

[1] Because the trial court granted summary judgment, we review the factual record in the light most favorable to Dr. Shore, the non-moving party. *See Harpagon Mo., LLC v. Clay Cty. Collector*, 335 S.W.3d 99, 102 (Mo. App. W.D. 2011). The facts as set forth in this opinion, therefore, are only those that are either not disputed by the parties or, if disputed, are reviewed in the light as alleged or testified by Dr. Shore to have occurred.

Several days later, on November 3, 2010, at a senior staff meeting, Hem/Onc doctors were discussing how to lighten the workload for Hem/Onc residents. Dr. Shore stated, "I may be going to hang myself with this, but . . .," and suggested that sickle-cell patients be placed on the general pediatrics service and that the hematologists only serve as consultants in their care. This suggestion offended Dr. Woods, who later told Dr. Shore that he felt that his comment was a betrayal of their friendship, was disrespectful, and was racist. Later that same evening, Dr. Shore wrote an email apology to Dr. Woods stating that he did not mean to offend Dr. Woods. In response, Dr. Woods wrote back to Dr. Shore:

> Based on your actions last night, our conversation last Friday meant nothing! Your words were not only hurtful, but selfish and disrespectful. I expected more compassion from you, but that was clearly a misguided thought. At this point, do your job, try to stay out of trouble, and we will not have any immediate problems. Trying to engage me further beyond professional matters[] will only make things worse!

After this exchange, Dr. Shore believed that Dr. Woods did not like him and that Dr. Woods treated him unfairly, finding fault with everything that Dr. Shore did. In fact, according to Dr. Shore, after his sickle-cell comment, "[e]very action that took place over the next two years was based on that comment and getting me out of his life and out of Children's Mercy Hospital."

Thereafter, Dr. Woods treated Dr. Shore coolly, removed Dr. Shore from a Hem/Onc committee, and refused to support Dr. Shore's effort to expand his professional practice. Although Dr. Shore acknowledged that his personality caused others to perceive him as loud, direct, and even rude and obnoxious, he felt that Dr. Woods's attitude toward him was undeserved and that it was attributable, in part, to Dr. Woods's mistaken belief that Dr. Shore was, in fact, a racist. Dr. Shore shared this view with Children's Mercy's Human Resources personnel and, in December of 2010, also met with the Children's Mercy's Chair of Pediatrics

3

and told him that Dr. Woods had called him a racist. Dr. Woods was aware that Dr. Shore had complained about him in these meetings.

In July 2011, in response to the conflict between Drs. Shore and Woods, Children's Mercy removed Dr. Shore from Dr. Woods's direct supervision and placed him under the direct supervision of Dr. Alan Gamis (Caucasian male). During the time that Dr. Shore was under Dr. Gamis's supervision, various Hem/Onc nurses and support staff complained about Dr. Shore's rude or otherwise inappropriate behavior.[2] Dr. Gamis discussed these issues with Dr. Shore and counseled Dr. Shore about the complaints. In January 2012, while Dr. Shore was still under Dr. Gamis's immediate supervision, Children's Mercy Human Resources personnel and the Chair of Pediatrics met with Dr. Shore to discuss his problematic workplace behaviors. None of these meetings or conversations involved input or participation by Dr. Woods.

In May 2012, Dr. Shore's permanent office was moved back to the main hospital building from the modular unit across the street, and Dr. Shore was re-assigned to Dr. Woods's direct supervision shortly thereafter in June 2012. Although Dr. Shore had complained about moving *from* the hospital to the modular unit for months, he also opposed moving *back* to the main building from the modular unit. In an email conversation with the Chair of Pediatrics (Dr. Michael Artman) on May 17, 2012, Dr. Woods expressed his frustration with Dr. Shore's continuing "whininess that stirs the pot." Dr. Artman responded with an understanding of the tension between Drs. Woods and Shore, but asked Dr. Woods to "step back" and remember to supervise Dr. Shore similarly to Dr. Shore's other colleagues on the Hem/Onc Division (which was comprised of seventeen Caucasians and four non-Caucasians).

---

[2] In fact, part of the basis of Dr. Shore's religious discrimination claim—which he has subsequently abandoned—was that he understood that people in the "Midwest" perceived him as "disrespectful, rude, and flippant" and his explanation was that "being from the Northeast, and being Jewish, I have sometimes stuck out like a sore thumb." Apparently, Dr. Shore felt like the unfair perception of his rude behavior was somehow tied to "Midwesterners" discriminating against him because of his religion, at least the "Northeast" version of his religion.

Thereafter, Dr. Woods received additional complaints about Dr. Shore and, on July 17, 2012, Dr. Woods gave Dr. Shore a written warning stating that, despite his counseling in January of 2012, Dr. Shore had engaged in "inappropriate and disruptive" behaviors including:

- Interactions with an APN [nurse] which were described as 'rude and confrontational.'
- A 'public' complaint about Dr. Woods['s] Instruction(s) for your moving from Modular 3 offices to the main office area.
- Making an individual decision that you would not be renewing your Kansas license and therefore would not be fulfilling your assignments at CMS[3] for this current academic year.
- Persistent 'badgering' of your administrative assistant to submit a request for an expenditure (that was later determined to be unreasonable).

Dr. Shore was not terminated at that time. However, following this written warning, on October 4, 2012, another female employee complained about Dr. Shore, accusing him of inappropriate workplace behavior, including Dr. Shore's use of the word "f**k." Dr. Shore admitted to using the word at least one time on that day but denied other behaviors alleged by the female employee relating to sexual harassment. After receiving this latest complaint, Dr. Woods terminated Dr. Shore's employment with Children's Mercy.

Dr. Shore sued Children's Mercy and Dr. Woods under the MHRA alleging discrimination on the basis of race and religion and retaliation for having complained of Dr. Woods's unfair treatment of him. Dr. Woods and Children's Mercy filed a motion for summary judgment, claiming that Dr. Shore had failed to present a genuine issue of material fact that Dr. Woods's treatment of, and attitude toward, Dr. Shore were based upon his race (Caucasian) or his religion (Jewish) rather than Dr. Shore's own inappropriate behaviors. Children's Mercy and Dr. Woods also claimed that Dr. Shore had failed to present a genuine issue of material fact that retaliation was a contributing factor in his termination because

---

[3] CMS is Children's Mercy South, a branch of the hospital located in Kansas. Physicians "covering" the Kansas location's Hem/Onc clinic were required to maintain Kansas licenses.

Dr. Shore had not engaged in any protected activity in that he never complained that Dr. Woods's dislike of him was based upon his religion or his race. The trial court granted the motion for summary judgment, and this appeal follows, although Dr. Shore does not appeal the grant of summary judgment with respect to his claim of religious discrimination.

**Standard of Review**

We review the grant of summary judgment *de novo*. *ITT Commercial Fin. Corp. v. Mid-Am. Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993). Our criteria when reviewing the grant of summary judgment are no different than those that the trial court should have used to sustain the motion initially. *Id*. We review the record in the light most favorable to the party against whom judgment was entered and give the non-moving party the benefit of all inferences that are reasonable from the record. *Cent. Mo. Elec. Co-op v. Balke*, 119 S.W.3d 627, 635 (Mo. App. W.D. 2003). "A defending party can demonstrate entitlement to summary judgment by showing: (1) facts negating any of the claimant's necessary elements; (2) the claimant, after an adequate period of discovery, has been unable, and will not be able, to produce evidence sufficient to allow the trier of fact to find the existence of any one of the claimant's elements; or (3) there is no genuine dispute of the existence of facts required to support the defending party's properly pleaded affirmative defense." *Scottsdale Ins. Co. v. Addison Ins. Co.*, 448 S.W.3d 818, 826 (Mo. banc 2014).

**Analysis**

Dr. Shore's first point on appeal is that the trial court erred in granting summary judgment relating to his count of racial discrimination under section 213.055. Dr. Shore improperly conflates the discrimination of persons because of their race with the disdain an employer may have for an employee who is believed to possess racist beliefs—whether or not

the employer's assessment of the employee's beliefs was accurate. The former is a protected class, while the latter simply is not.

The MHRA prohibits employment discrimination on the basis of race. § 213.055. Normally, when a petition alleges employment discrimination on the basis of race, summary judgment is inappropriate, because these cases "are inherently fact-based and often depend on inferences rather than on direct evidence" of intent to discriminate. *Herndon v. City of Manchester*, 284 S.W.3d 682, 686 (Mo. App. E.D. 2009) (internal quotation omitted). As is common, in this case there is no direct evidence that Dr. Woods or any other Children's Mercy employee discriminated against Dr. Shore on the basis of his race (Caucasian); in other words, neither Dr. Woods nor any other Children's Mercy employee was alleged to have made any derogatory statements about Caucasians generally. Therefore, we look to see whether the facts alleged by Dr. Shore give rise to any reasonable inference that he was discriminated against because he is Caucasian.

Dr. Shore was hired by Children's Mercy, at Dr. Woods's recommendation, with full knowledge of Dr. Shore's race. In addition, Dr. Shore received regular raises during his employment at Children's Mercy as well as a promotion to Associate Professor. While disparate treatment of members of a particular protected class could show discrimination, *see Buchheit, Inc. v. Mo. Comm'n on Human Rights*, 215 S.W.3d 268, 277 (Mo. App. W.D. 2007); *Ruppel v. City of Valley Park*, 318 S.W.3d 179, 185 (Mo. App. E.D. 2010), Dr. Shore does not point to any term or condition of employment that he was denied that other non-Caucasian employees received. Indeed, the other physicians in the Hem/Onc division of Children's Mercy were overwhelmingly Caucasian—seventeen of twenty-one. Dr. Shore does not show that he was

7

treated differently by Dr. Woods or Children's Mercy from the way non-Caucasians were treated.

On the contrary, by Dr. Shore's own testimony, he and Dr. Woods were "friends" or at least "friendly" for the first five years of Dr. Shore's employment at Children's Mercy. Dr. Woods invited Dr. Shore to his house to play tennis, invited him to join his fantasy football league, invited him and his wife to a social event with other Children's Mercy senior staff, and went bowling with him. In fact, Dr. Woods gave Dr. Shore *special* treatment at Children's Mercy. When several doctors were asked to move from the main hospital building to the modular unit across the street, Dr. Woods asked Dr. Shore to serve as a mentor for the other doctors making the move. Then, when, after six months following the move, Dr. Shore was still complaining about the location of his office in the modular unit, Dr. Woods allowed Dr. Shore to use office space in the main hospital building. Dr. Shore acknowledged that this was a small but significant gesture of friendship by Dr. Woods. At the same meeting during which Dr. Woods made this gesture, he also personally confided to Dr. Shore that he was disappointed in the attitudes of some of the Hem/Onc doctors and staff toward the sickle-cell patients. Dr. Woods explained that the sickle-cell patients were important to him and that caring for them was a big part of his life's work. This collegial relationship between Drs. Woods and Shore from 2005 until at least mid-2010 in no way evidences or supports any inference that Dr. Woods had any racial animus toward Dr. Shore, and Dr. Shore points to no other incidents where Dr. Woods or any other Children's Mercy employee had ever shown any racial animus to a Caucasian employee.

Instead, Dr. Shore stated in his deposition testimony that his collegial relationship with Dr. Woods changed in 2010, after Dr. Shore had complained for months about his office move to

the modular unit and then, especially, after he proposed at a senior staff meeting changing the way sickle-cell patients were admitted and treated at Children's Mercy. Dr. Shore admittedly knew that his suggestion (i.e., recommending that sickle-cell patients be placed on the general pediatrics service and that the hematologists only serve as consultants in their care) would not be well received by Dr. Woods and even prefaced his suggestion at the staff meeting by saying, "I may be going to hang myself with this, but . . . ." Dr. Shore further explained the magnitude of the November 2010 meeting as follows:

> Q: Is it your understanding that the reason you were removed from the hematology/oncology ER committee was because of the comments you made in the November 2010 meeting?
>
> A: Yes.
>
> Q: Is the same true of the—removing you from the fellow-interviewing committee?
>
> A: Yes.
>
> Q: So you—
>
> A: To answer your question, and then you can go through for the next two years. *Every action that took place over the next two years was based on that comment and getting me out of his life and out of Children's Mercy Hospital*.
>
> Q: Because of that comment?
>
> A: Yes. I offended him. I disrespected him.
>
> . . . .
>
> Q: When you wrote that you were being treated unfairly, what did you mean?
>
> A: I'd been bullied and picked on by Dr. Woods on a continual basis.
>
> Q: Because he didn't like you?
>
> A: *Because he did not like me, and he wanted me out of his life*.

Q: And all of that relates back to the office move in 2010 and the comments in November 2010?

A: It would appear that was when—those—those are episodes I can clearly remember. Something changed with Dr. Woods around that time.

Q: *Do you think there was a causal relationship between the office move events and the comments about sickle cell patients in the November 2010 meeting?*

A: *I believe there's direct cause and effect.*

(Emphasis added.) Thus, by Dr. Shore's own admission, he was terminated by Dr. Woods as a "direct cause and effect" of his own behavior—behavior that Dr. Woods considered to be offensive, disrespectful, and a betrayal of their friendship—and *not* because Dr. Woods or Children's Mercy suddenly became hostile to Caucasians generally or to Dr. Shore specifically because he was Caucasian. Dr. Shore admits that, after his incessant complaints about his office location and his recommendation for treatment of sickle-cell patients, Dr. Woods "did not like me, and he wanted me out of his life." Neither of these incidents had anything to do with the color of Dr. Shore's skin.

In the face of these admissions, Dr. Shore points to one additional comment by Dr. Woods after the November 2010 meeting—that in addition to accusing Dr. Shore of being offensive, disrespectful, and unfriendly, Dr. Woods also accused Dr. Shore of being a racist (which is, by the way, a race-neutral characterization as racism is not an evil confined to one race). Essentially, Dr. Shore complains not that he was discriminated against because he was Caucasian, but rather, because Dr. Woods falsely believed him to be a person who possesses discriminatory or prejudicial beliefs about others because of their race.[4]

---

[4] Though federal case precedent on this topic is not binding upon this court, we find the numerous federal cases discussing this topic or closely analogous topics of alleged discrimination to be persuasive. "An employer may discharge an employee believed to be racist without running afoul of Title VII." *Devine v. Pittsburgh Bd. of Pub. Educ.*, No. 2:13-cv-220, 2015 WL 7871059, at *4 n.2 (W.D. Pa. Dec. 3, 2015); *see also Bellamy v. Mason's Stores, Inc.*, 368 F.Supp. 1025 (E.D. Va. 1973), *aff'd sub nom. Bellamy v. Mason's Stores, Inc. (Richmond)*, 508

Section 213.055 prohibits discrimination "because of the race, color, religion, national origin, sex, ancestry, age or disability of any individual." Therefore, in an attempt to infer as a matter of law that Dr. Woods discriminated against him on the basis of his race (i.e., Caucasian), Dr. Shore argues that calling someone a racist or believing him to be a racist is itself a form of racial discrimination. While we agree that falsely accusing someone of being a racist is morally wrong and could, under certain additional circumstances, support a claim of defamation (though the only one "publishing" the alleged false racism comment appears to have been Dr. Shore, not Dr. Woods), the present lawsuit is not based upon a claim of defamation. Instead, this is a racial discrimination claim filed pursuant to the MHRA, and Dr. Shore cites to no authority supporting the proposition that an *employee's* conduct misinterpreted by an employer as racially motivated can itself form the basis for a section 213.055 discrimination claim on the basis of "race." Instead, Missouri precedent interpreting discrimination on the basis of "race" are confined to evaluating whether an *employer's* conduct constituted discrimination of an employee because of the color of his skin, as opposed to the substance of the employee's beliefs (accurate or inaccurate) on issues relating to "race." *See, e.g., Hill v. City of St. Louis*, 371 S.W.3d 66 (Mo. App. E.D. 2012); *Howard v. City of Kansas City*, 332 S.W.3d 772 (Mo. App. W.D. 2011); *Smith v. Aquila, Inc.*, 229 S.W.3d 106 (Mo. App. W.D. 2007); *McBryde v. Rittenour Sch. Dist.*, 207 S.W.3d 162 (Mo. App. E.D. 2006). Here, the undisputed facts demonstrate that Dr. Shore was *not* discriminated against *because* he was Caucasian; hence, his claim for racial discrimination fails as a matter of law.

F.2d 504 (4th Cir. 1974) (The scope of 42 U.S.C. § 2000e, which prohibits discrimination in employment practices on the basis of race, color, religion, sex, or national origin, does not extend protection to an employee claiming to have been terminated on basis of his membership in a racist and anti-Semitic organization.); *Balazs v. Liebenthal*, 32 F.3d 151, 155 (4th Cir. 1994) ("An allegation that he was falsely accused of [sexual harassment] which, if true, might have given rise to a claim of employment discrimination based on sex by someone else in no way states a cause of action that plaintiff himself was a victim of discrimination based on his sex."); *Albert v. Edward J. DeBartolo Corp.*, 999 F.2d 539 (6th Cir. 1993) ("Plaintiff's true complaint is that he was wrongfully discharged because of false accusations of sexual harassment, a claim that is not cognizable under Title VII.").

Because Dr. Shore failed to establish that a genuine issue of fact exists as to whether his race (Caucasian) was a contributing factor to any adverse employment action taken against him, the trial court properly granted summary judgment on Dr. Shore's section 213.055 claim.

Point I is denied.

Dr. Shore's second point on appeal is that the trial court erred in granting summary judgment against him on his retaliation claim pursuant to section 213.070 because there is sufficient evidence upon which a jury could infer that Dr. Woods's decision to terminate Dr. Shore was due to Dr. Shore's protected activity of complaining to Children's Mercy Human Resources and Children's Mercy management that Dr. Woods was discriminating against him.

Section 213.070(2) makes it unlawful for an employer "[t]o retaliate or discriminate in any manner against any other person because such person has opposed any practice prohibited by this chapter." To establish a prima facie case, the employee must prove: (1) that he complained of discrimination; (2) that the employer took adverse action against him; and (3) that the complaint and the adverse action are causally related. *McCrainey v. Kansas City, Mo. Sch. Dist.*, 337 S.W.3d 746, 753 (Mo. App. E.D. 2011). The complaint of discrimination does not have to involve actual discrimination for a retaliation claim to stand. "In general, as long as a plaintiff had a reasonable, good faith belief that there were grounds for a claim of discrimination or harassment, the success or failure of a retaliation claim is analytically divorced from the merits of the underlying discrimination or harassment claim." *Id.* (internal quotation omitted).

Referencing our discussion relating to Point I, we likewise conclude that Dr. Shore could not have had a reasonable, good faith belief that he had alleged grounds for discrimination, because he never complained to Human Resources, to his interim supervisor (Dr. Gamis), or to the Chair of Pediatrics (Dr. Artman) in his many meetings with them that Dr. Woods had

12

discriminated against him on the basis that he was Caucasian. However, even if Dr. Shore's complaints could somehow be inferred to allege discrimination on the basis of race, he has not shown any causal connection between his complaints and any adverse employment action.

As stated above, Dr. Shore's own testimony traces all of Dr. Woods's animosity toward him directly to his complaints about his April 2010 office move and his comment regarding sickle-cell patients in the November 2010 Senior Staff meeting—not to Dr. Shore's subsequent complaints about Dr. Woods's resulting disdain for him.

Moreover, after Dr. Shore was removed from Dr. Woods's direct supervision, Dr. Shore continued to receive discipline based upon "numerous" complaints about his behavior from either patients' parents or staff members other than Dr. Woods, which complaints had nothing to do with Dr. Woods. These complaints against Dr. Shore largely involved his rude and disrespectful treatment of other people and his vocal objection to having his office moved *back* into the main hospital building after having objected to the move *out* of the main hospital building for a period spanning several months. Dr. Gamis, Dr. Shore's interim supervisor, counseled Dr. Shore about these incidents, and Dr. Shore was given ten-point performance counseling by the Director of Employee Relations and the Chair of Pediatrics while he was still under Dr. Gamis's direct supervision. Dr. Shore has never alleged that Dr. Gamis or Dr. Artman had any discriminatory animus toward Dr. Shore nor has he alleged that Dr. Gamis was retaliating for Dr. Shore's complaints regarding Dr. Woods.

Finally, although Dr. Woods did resume the direct supervision of Dr. Shore in June of 2012, it was not until October of 2012, after yet another nurse had complained about Dr. Shore's inappropriate behavior, that Dr. Woods decided to terminate Dr. Shore's employment with Children's Mercy. Although Dr. Shore disputes the merits of certain details of the complaints

13

patients, patients' parents, and other staff members had made against him in the time between when he complained of Dr. Woods's "discrimination" against him in November of 2010 and his October 2012 termination, he does not dispute that the complaints exist, nor does he allege that they were in any way motivated or occasioned in retaliation for any complaints Dr. Shore had made against Dr. Woods. Because no jury could reasonably infer that Dr. Shore's termination was not occasioned by his employment performance issues, for which he received counseling in the two years prior to his termination, and was instead motivated by Dr. Woods's retaliation against him for having two years prior complained to Children's Mercy Human Resources that Dr. Woods had called him a racist, the trial court did not err in granting summary judgment on Dr. Shore's retaliation claim.

Point II is denied.

### Conclusion

The judgment of the trial court is affirmed.

_____
Mark D. Pfeiffer, Presiding Judge

Lisa White Hardwick and James Edward Welsh, Judges, concur.

14