# United States Court of Appeals

### For the Eighth Circuit

_____

No. 17-3673

_____

Sandra Lovelace; Stephen Lovelace

*Plaintiffs - Appellants*

v.

Washington University School of Medicine; Barnes-Jewish Hospital

*Defendants - Appellees*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: April 16, 2019
Filed: July 25, 2019

_____

Before SMITH, Chief Judge, ARNOLD and KELLY, Circuit Judges.

_____

SMITH, Chief Judge.

Sandra Lovelace sued her employers, Washington University School of Medicine (WUSM) and Barnes Jewish Hospital (BJH), claiming they unlawfully terminated her in retaliation for exercising her rights under the Family and Medical Leave Act (FMLA) and the Missouri Human Rights Act (MHRA). Lovelace's

husband, Stephen, also sued for loss of consortium. The district court[1] granted summary judgment in favor of WUSM and BJH. We affirm.[2]

## I. *Background*

WUSM employed Lovelace as a Medical Assistant (MA) from November 2003 to August 5, 2015. MAs assist doctors' clinical teams by performing non-medical tasks such as scheduling, answering phones, and placing orders. Lovelace worked for one doctor's team from November 2003 to 2007 and for a different doctor's team from 2007 to December 2014. Clinical Nurse Manager Paula Goldberg, a BJH employee, began supervising Lovelace in 2007, and MA Supervisor Dee Brinkley, a WUSM employee, also began supervising her in September 2014. In 2009, Lovelace applied for and received FMLA leave without incident. Both Goldberg and Brinkley supervised Lovelace when the instant dispute arose.

Beginning in December 2014, Lovelace stopped working for a single doctor's team and started "floating" among different teams. Lovelace began to experience problems at work shortly after the switch from a single, permanent team placement to several, temporary placements. On December 10, Lovelace was assigned to work with Dr. Douglas Adkins's team. That same day, Lovelace left early due to back pain. A few days later, after Lovelace had not returned to work, Goldberg e-mailed Lovelace advising her of the potential need to complete FMLA paperwork. Lovelace subsequently applied for and was granted FMLA leave.

Initially, Lovelace planned to return from leave on February 9, 2015. That very morning, however, Lovelace e-mailed Goldberg that she would not be returning that

---

[1]The Honorable Rodney W. Sippel, Chief Judge, United States District Court for the Eastern District of Missouri.

[2]Lovelace filed a motion to supplement the record after the instant case had been appealed. We deny the motion, finding the record before us sufficient.

day. Goldberg forwarded Lovelace's e-mail to Brinkley. The two supervisors expressed frustration at the timing of Lovelace's notice. In one e-mail, Goldberg suggested to Brinkley that she could hire someone else if Lovelace did not return in a month.

Lovelace had back surgery on February 20. Though the surgery was successful, Lovelace required certain minor work accommodations, such as taking breaks to stand, stretch, or walk. Lovelace returned to work on March 4, and Brinkley assigned her back to Dr. Adkins's team. However, Dr. Adkins's team had recently hired an MA named Angela Butcher, and once Butcher was trained, Lovelace began "floating" among teams again.

From April to July, Lovelace worked with Dr. Manik Amin and nurse Deb Orf. Lovelace apparently worked well with Dr. Amin's team initially, but Orf soon began reporting issues with Lovelace. Orf stated that Lovelace "would refuse to do tasks, sometimes stating that she did not know how to do them." Statement of Material Facts, Decl. of Debbie Orf at 2, *Lovelace v. Washington Univ. Sch. of Med.*, No. 4:15-cv-01694-RWS (E.D. Mo. Apr. 14, 2017), ECF No. 38-10. Orf reported her concerns to Brinkley, explaining "that it was more challenging to get the work done with Ms. Lovelace than without an MA at all," and in July, she also reported her concerns to Goldberg. *Id.* at 3.

During Lovelace's annual performance review in April 2015, Goldberg discussed Lovelace's performance following her return from FMLA leave. Goldberg mentioned Lovelace's frequent absences from her work station, but Lovelace reminded Goldberg about her need to stand, stretch, and walk post-surgery. After their meeting, Goldberg invited Lovelace to revise her evaluation to reflect more positively on her performance, and Lovelace did so. Shortly thereafter, Lovelace met with Bob Barczewski, WUSM Director of Business Operations, to complain about

Goldberg's treatment of her since her return. She also met with Human Resources Consultant Sandra Sledge.

In July 2015, Goldberg and Brinkley discussed Lovelace's performance with several of the hospital's doctors and nurses. During one of these discussions, Dr. Brian Van Tine reported that Lovelace, who is white, allegedly commented that a black coworker, Angela Butcher, did not like working with white people ("the Butcher comment"). On July 10, Goldberg e-mailed Sledge summarizing her concerns about Lovelace. Goldberg expressed her opinion that Lovelace was "not prepared for the demands of the [MA] position," as the position's requirements had "evolved" over time. Resp. to Statement of Material Facts, Ex. 7 at 1, *Lovelace v. Washington Univ. Sch. of Med.*, No. 4:15-cv-01694-RWS (E.D. Mo. June 9, 2017), ECF No. 51-8. She explained that Lovelace's lack of readiness "cause[d] her to avoid work, push work off and have others do the work" and suggested that Lovelace would be more effective in "a less stressful, demanding position in another department." *Id.* Finally, Goldberg noted that she had "enough to fire [Lovelace]," and while she believed she could issue a written warning, she planned on issuing a verbal warning instead. *Id.* Sledge advised "pointing out to [Lovelace] the needs of the position and where she is and is not meeting" expectations instead of suggesting a different position, and she encouraged Goldberg to continue accommodating Lovelace's "need for rest times (within reason)." *Id.*

On July 13, Goldberg, Brinkley, and Lovelace met to discuss Lovelace's performance and conduct, and Goldberg specifically inquired about the Butcher comment. Lovelace denied making the comment and claimed her supervisors were accusing her of racism. At her deposition, Lovelace admitted that no one had called her a racist and that no "negative comments [were] ever made about [her] race or ethnicity in the workplace." Statement of Material Facts, Dep. of Sandra Lovelace at 20, *Lovelace v. Washington Univ. Sch. of Med.*, No. 4:15-cv-01694-RWS (E.D. Mo.

Apr. 14, 2017), ECF No. 38-1. When asked how she had been a victim of racial discrimination, she explained that she "was labeled a racist." *Id.* at 14.

Following the July 13 meeting, Lovelace met with Sledge to complain about her supervisors allegedly labeling her a racist. She also claimed her supervisors were retaliating against her for taking FMLA leave. Sledge began investigating Lovelace's claims, but Lovelace, dissatisfied with Sledge's review process, presented her complaints directly to Human Resources Manager Leanne Stewart on July 21 and 24. Stewart ultimately concluded there had been no retaliation.

Brinkley and Sledge scheduled a follow-up meeting with Lovelace for July 31 to again discuss her performance. Goldberg was not present. Brinkley presented Lovelace with a checklist of her duties to guide the discussion and reiterated the complaints they had received from different teams. The criticism upset Lovelace, and she was unable to discuss the matters with Brinkley or Sledge. She was particularly upset by Brinkley's attempt to discuss performance issues with her after she had filed an FMLA retaliation complaint. Lovelace asked to go home, and Sledge agreed.

Shortly thereafter, Brinkley went to check on Lovelace at her work station. According to Brinkley, when Lovelace saw her, she jumped, yelled at Brinkley not to touch her and to get away from her, and called her "evil." *Lovelace v. Washington Univ. Sch. of Med.*, No. 4:15-cv-01694-RWS, 2017 WL 5278118, at *2 (E.D. Mo. Nov. 13, 2017). A coworker also reported hearing Lovelace repeatedly yell "get away from me" at Brinkley. Statement of Material Facts, Decl. of Natalie Taylor at 2, *Lovelace v. Washington Univ. Sch. of Med.*, No. 4:15-cv-01694-RWS (E.D. Mo. Apr. 14, 2017), ECF No. 38-9. This coworker described Lovelace's behavior as "very unprofessional and disruptive" and "out of control." *Id.* By contrast, Lovelace maintained that she did not shout or scream during the incident. And, another witness, a nurse, told human resources (HR) that no one was shouting but that Lovelace was crying. Following the incident, Brinkley informed Sledge about the confrontation,

and Sledge sent Lovelace home. Lovelace asked whether she was being fired. Sledge said no.

That evening, Sledge e-mailed Barczewski to describe developments with Lovelace and to recommend placing Lovelace on leave. Barczewski notified Lovelace on August 2 that she was being placed on administrative leave. On August 4, Sledge, Stewart, Brinkley, and Goldberg met to discuss Lovelace's status. The group ultimately decided to recommend Lovelace's termination. The next day, Barczewski terminated Lovelace. In his discharge letter, Barczewski said Lovelace's July 31 office behavior caused her termination. In his deposition, Barczewski explained that while he had considered input from Stewart, Sledge, Brinkley, and Goldberg, it was his decision to terminate Lovelace and that he had written her discharge letter.

Lovelace sued both WUSM and BJH following her termination, alleging violations of the FMLA and MHRA. Specifically, she alleged that WUSM and BJH violated the FMLA by retaliating against her for taking leave and violated the MHRA by retaliating against her for making complaints about racial and disability discrimination.

The district court treated WUSM and BJH as Lovelace's joint employers and granted summary judgment in their favor. The court determined that Lovelace had failed to state a prima facie case of FMLA retaliation, as she had not met her burden of proving a causal connection between her termination and her FMLA leave. The court noted that "[c]onsidering the record as a whole, the evidence demonstrates that Lovelace was terminated for unrelated intervening non-retaliatory reasons." *Lovelace*, 2017 WL 5278118, at *5. The court also determined that Lovelace had failed to establish a genuine issue of material fact demonstrating retaliation based on a complaint of racial or disability discrimination. The district court also denied Stephen's loss of consortium claim on the basis that such a claim is "a derivative

claim that arises out of the original injury to the spouse." *Id.* at \*7 (internal quotation omitted).

## II. *Discussion*

> We review de novo a district court's grant of summary judgment. Summary judgment is proper if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. We consider the facts in the light most favorable to [Lovelace] and give her the benefit of all reasonable inferences in the record. There is no discrimination-case exception to a district court's power to grant summary judgment.

*Ebersole v. Novo Nordisk, Inc.*, 758 F.3d 917, 923 (8th Cir. 2014) (cleaned up).

## A. *FMLA Discrimination Claim*

On appeal, Lovelace renews her claims that WUSM and BJH terminated her in retaliation for taking FMLA leave.

The FMLA provides that "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period" if the employee satisfies certain statutory requirements. 29 U.S.C. § 2612(a)(1). The FMLA "makes it unlawful for an employer to 'interfere with, restrain, or deny the exercise of or the attempt to exercise' rights provided under the FMLA." *Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1005 (8th Cir. 2012) (quoting 29 U.S.C. § 2615(a)(1)). One type of FMLA claim that we have recognized

> arises when an employer takes adverse action against an employee because the employee exercises rights to which he is entitled under the FMLA. In this scenario, the employer does not prevent the employee from receiving FMLA benefits. Rather, it is alleged that after the employee exercised his statutory rights, the employer discriminated

-7-

against him in the terms and conditions of employment. An employee making this type of claim must prove that the employer was motivated by the employee's exercise of rights under the FMLA. The textual basis for such a claim is not well developed in our cases, but the claim likely arises under the rule of § 2615(a)(1) that an employer may not interfere with, restrain, or deny the exercise of or the attempt to exercise rights defined by the FMLA.

*Id.* at 1006 (cleaned up).

While the parties and district court refer to this type of claim as a retaliation claim, it is "more properly characterized as [a] discrimination claim." *Jackson v. City of Hot Springs*, 751 F.3d 855, 858 n.1 (8th Cir. 2014) (citing *Pulczinski*, 691 F.3d at 1006). We apply the *McDonnell Douglas* burden-shifting framework to FMLA discrimination claims. *Pulczinski*, 691 F.3d at 1007. "To establish a *prima facie* case of FMLA discrimination, an employee must show: (1) that he engaged in activity protected under the Act, (2) that he suffered a materially adverse employment action, and (3) that a causal connection existed between the employee's action and the adverse employment action." *Id.* The "employee must prove that [her] exercise of FMLA rights 'played a part' in the employer's decision." *Id.* (citation omitted).

To establish causation, an employee must present "evidence that gives rise to an inference of . . . a [discriminatory] motive." *Kipp v. Mo. Highway & Transp. Comm'n.*, 280 F.3d 893, 897 (8th Cir. 2002). Though temporal proximity between the use of leave and termination may establish a causal link between the two events, such proximity is "rarely" sufficient by itself, *id.*, unless the time relation is "extremely close." *Ebersole*, 758 F.3d at 925. Furthermore, an employee's use of FMLA does not insulate her from employment decisions that are based on grounds other than FMLA usage. *Id.* at 923.

Lovelace argues that the timing of her termination suggests retaliation. We disagree. The opposite is true. About nine months elapsed from the beginning of Lovelace's FMLA leave and her termination and about five months between her return from leave and her termination. "[W]e have [previously] determined that a one-month or two-month lag is too long [to establish a causal connection] absent other evidence." *Id.* at 925. Given the time span in this case, Lovelace was required to present "something more" than temporal proximity. *Sisk v. Picture People, Inc.*, 669 F.3d 896, 901 (8th Cir. 2012). Lovelace's use of FMLA leave some half-year prior to her termination is insufficient to show her termination was an act of discrimination.

As additional evidence, Lovelace alleges that her supervisors conspired against her to "create" performance issues justifying her termination. Appellants' Br. at 28. As proof, Lovelace notes that she received positive evaluations during her prior years of employment with WUSM and BJH. However, an employee's prior satisfactory service does not insulate her from adverse consequences following a later lapse in performance. And, Lovelace presents no evidence that the performance and behavioral complaints voiced by her colleagues—in particular, Orf and Dr. Van Tine—were not genuine. These complaints, whether true or false, provided a nondiscriminatory basis for Lovelace's supervisors to discuss her work performance. Lovelace's supervisors offered her the opportunity to revise her initially negative performance review. The events that followed the July 31 meeting have not been shown to be related to Lovelace's use of FMLA or any animus towards that use. The decision to terminate Lovelace based on the office incident may have been mistaken or imprudent, but in order to be actionable, it must be shown to be connected to Lovelace's use of FMLA leave. The record in this case simply does not establish this connection.

Lovelace admits that she was unwilling to discuss her performance with Sledge and Brinkley on July 31 and that she asked to be excused from the meeting.

Barczewski's August 5 termination letter identified Lovelace's July 31 post-meeting behavior as the cause for her termination. Lovelace does not dispute that Barczewski would have had the right to terminate her for the reported outburst.[3]

Lovelace's "intervening unprotected conduct"—i.e., her refusal to engage with Brinkley and Sledge on July 31 and her subsequent outburst—ended any connection there might have between her FMLA leave and her eventual termination. *See Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999) (en banc) ("Although contesting an unlawful employment practice is protected conduct, the anti-discrimination statutes do not insulate an employee from discipline for violating the employer's rules or disrupting the workplace.").

The district court did not err in granting WUSM and BJH summary judgment on Lovelace's FMLA discrimination claim.

### B. *MHRA Retaliation Claim*
The MHRA

> makes it an unlawful discriminatory practice to retaliate or discriminate
> in any manner against any other person because such person has

---

[3]Lovelace argues "cat's paw" retaliation in an attempt to establish the requisite connection between her FMLA leave and Barczewski's decision to terminate her, essentially arguing that Goldberg and Brinkley duped Barczewski into terminating Lovelace based on *their* "disgust" at her having taken FMLA leave. Appellants' Br. at 25. However, "cat's paw" liability "requires that there be a person possessing both (1) the necessary [discriminatory] animus and (2) influence, leverage or control over the decisionmaker, such that it could be said the decisionmaker was acting at the person's bidding." *Edwards v. Lynch*, 111 F. Supp. 3d 989, 1003 (W.D. Mo. 2015). Here, among other things, there is no evidence that Barczewski did not terminate Lovelace of his own volition, based on the July 31 incident. In fact, Goldberg was not even present at the July 31 meeting that precipitated Lovelace's termination.

opposed any practice prohibited by this chapter. To establish a prima facie case of retaliation under the MHRA, a plaintiff must prove that: (1) he complained of discrimination; (2) the employer took adverse action against him; and (3) a causal relationship existed between the complaint and the adverse action.

*McCrainey v. Kansas City Mo. Sch. Dist.*, 337 S.W.3d 746, 752–53 (Mo. Ct. App. 2011) (internal quotation omitted). While "[a] retaliation claim is not conditioned on the success of the underlying discrimination or harassment claim," the complaining employee must have "had a reasonable good faith belief that there were grounds for the claim of discrimination or harassment." *Soto v. Costco Wholesale Corp.*, 502 S.W.3d 38, 48 (Mo. Ct. App. 2016) (quoting *Minze v. Mo. Dep't of Pub. Safety*, 437 S.W.3d 271, 275–76 (Mo. Ct. App. 2014)). "[T]he success or failure of a retaliation claim is analytically divorced from the merits of the underlying discrimination or harassment claim" "as long as" the employee had a reasonable good faith belief that there were grounds to bring the claim. *McCrainey*, 337 S.W.3d at 753 (quoting *Wallace v. DTG Operations, Inc.*, 442 F.3d 1112, 1118 (8th Cir. 2006), *overruled on other grounds by Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011) (en banc)).

Lovelace argues the district court erred by analyzing both her racial and disability discrimination claims on the basis of their underlying success. Lovelace misinterprets the district court's analysis. Though Missouri law does not require an employee bringing an MHRA retaliation claim to be certain on the claim's success, it does require the employee to have "a reasonable good faith belief" that there are grounds for making the underlying discrimination claim. *Soto*, 502 S.W.3d at 48 (quoting *Minze*, 437 S.W.3d at 276). Determining whether such a belief existed necessarily requires some reference to the elements of the type of discrimination alleged.

Lovelace claims that WUSM and BJH retaliated against her for complaining of racial discrimination to HR. She explains that because "race [was] involved" in the Butcher comment, her complaint to HR about Brinkley's questions related to the Butcher comment constituted a complaint about racial discrimination. Appellants' Br. at 33. Lovelace misunderstands what qualifies as racial discrimination by equating accusations of racist behavior with racist behavior itself. However, "Missouri precedent interpreting discrimination on the basis of 'race' are confined to evaluating whether an *employer's* conduct constituted discrimination of an employee *because of the color of [her] skin*, as opposed to the substance of the employee's beliefs (accurate or inaccurate) on issues relating to 'race.'" *Shore v. Children's Mercy Hosp.*, 477 S.W.3d 727, 735 (Mo. Ct. App. 2015) (second emphasis added). While "falsely accusing someone of being a racist is morally wrong," such accusations cannot form the basis of an MHRA racial discrimination claim. *Id.* at 734. For purposes of the MHRA, accusing an employee of racism does not constitute racial discrimination.

Here, Lovelace does not claim that she was discriminated against "because of the color of [her] skin." *Id.* at 735. Lovelace had no legitimate basis for believing Brinkley was discriminating against her on the basis of *her* race when Brinkley asked her whether she had made a comment based on *Butcher's* race; therefore, Lovelace also had no legitimate basis for believing she had complained of racial discrimination to HR. Because Lovelace could not have had a reasonable good faith belief that the conduct she opposed had constituted racial discrimination in violation of the MHRA, her MHRA racial discrimination retaliation claim fails. *See McCrainey*, 337 S.W.3d at 754.

Lovelace's disability discrimination retaliation claim similarly fails. We have explained that "[e]vidence of general temporary work restrictions, without more, is insufficient to constitute a disability," *Samuels v. Kansas City Mo. Sch. Dist.*, 437

-12-

F.3d 797, 803 (8th Cir. 2006),[4] and Lovelace admits that she "complained to HR that she was being harassed by Goldberg regarding *work place restrictions* following a surgery." Appellants' Br. at 35 (emphasis added). Lovelace also admits that she was not disabled, and she does not allege that Goldberg regarded her as disabled.

Because Lovelace could not have had a reasonable good faith belief that the conduct she opposed had constituted disability discrimination in violation of the MHRA, the district court did not err in granting summary judgment in favor of WUSM and BJH on Lovelace's MHRA retaliation claim. *See McCrainey*, 337 S.W.3d at 754.

## C. *Loss of Consortium*

As Lovelace correctly notes, "[t]he District Court was required to dismiss the loss of consortium claim brought by Ste[ph]en Lovelace because, under Missouri law, it is a derivative spousal claim." Appellants' Br. at 36. Because we affirm the district court's decision to grant summary judgment in favor of WUSM and BJH on the retaliation claims, we likewise affirm its decision to dismiss Stephen's loss of consortium claim.

## III. *Conclusion*

The judgment of the district court is affirmed.

_____

---

[4]Though Samuels is an ADA case, "[t]o the extent Missouri rulings have stated a test for determining disability from working, actual or perceived, they cite and follow Federal decisions." *Heuton v. Ford Motor Co.*, 309 F. Supp. 3d 714, 716 (W.D. Mo. 2018).