

# In the
# Missouri Court of Appeals
# Western District

| | |
|---|---|
| **CHARLOTTE JEAN KERR,** | **WD79372** |
| **Appellant,** | **OPINION FILED:** |
| **v.** | **December 13, 2016** |
| **THE CURATORS OF THE UNIVERSITY OF MISSOURI,** | |
| **Respondent.** | |

**Appeal from the Circuit Court of Boone County, Missouri**
**The Honorable Dorothea Christine Carpenter, Judge**

**Before Division Three:**
**Alok Ahuja, P.J., Victor C. Howard, and James Edward Welsh, JJ.**

Charlotte Jean Kerr appeals the circuit court's grant of summary judgment in favor of the Curators of the University of Missouri (University) on her claims of employment discrimination and retaliation under the Missouri Human Rights Acts (MHRA). Kerr contends that the circuit court erred in granting summary judgment for the University because (1) the court misstated and misapplied the elements of an MHRA age discrimination claim, (2) she demonstrated genuine disputes of material fact on her age discrimination claim; (3) she demonstrated a genuine dispute of material fact on her disability discrimination claim, and (4) the court misstated and misapplied

the law when it found that summary judgment on her MHRA discrimination claims caused her retaliation claim to fail as a matter of law. We affirm.

When considering an appeal from summary judgment, we view the record in the light most favorable to the party against whom judgment was entered, and we afford that party the benefit of all reasonable inferences. *ITT Com. Fin. Corp. v. Mid-Am. Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993). The record established that, at the times relevant to these claims, Kerr was over 40 years of age. She was diagnosed with bipolar disorder, post-traumatic stress disorder, attention deficit disorder, chronic depression, Crohn's disease, and spinal stenosis.

Kerr was employed as an animal caretaker at the Laboratory Animal Center (LAC), which is an animal care facility operated by the Office of Animal Resources (OAR) at the University of Missouri—Columbia. Kerr's immediate supervisor was Clayton Douglas. Douglas's supervisor was Dana Weir, the Facilities Manager for the OAR. Weir's supervisor was Dr. Lon Dixon. Tom Malloy was an animal technician at the OAR and the "lead technician" on weekends. Malloy was sometimes referred to as the "weekend supervisor."

Kerr was a part-time employee and was the only part-time employee at the LAC beginning at least in 2010.[1] Kerr's employment with the OAR has always been part-time, and

---

[1]In her response to the University's Statement of Uncontroverted facts, Kerr denied that she was the only part-time employee at the LAC beginning at least in 2010. In support of its statement of fact, the University relied on the affidavit of Dana Weir. Dana Weir was the Facilities Manager of the OAR, and, in her affidavit she said that she had access to personnel records of the OAR and stated that "Kerr was the only part-time employee at the LAC beginning at least in 2010, continuing to the present." Kerr denied this statement of fact on the theory that Weir's affidavit did not indicate that Weir based her statement on her direct knowledge of the employment status of every other employee at the OAR or on any reference to the personnel records of the OAR. As Facilities Manager of the OAR, Weir stated that she was "personally acquainted with the facts" stated in the affidavit and that she had access to the personnel records at the OAR. As such, she is competent to testify about whether or not the LAC has part-time employees.

2

she has never applied for a full-time position with the University. Although she obtained certification as an Assistant Lab Animal Technologist, she never applied for a full-time position or a different job within the OAR.[2] Kerr said that she did not want to work full-time because of her Crohn's disease and because she has "difficulty socializing with humans."

As a part-time union employee, Kerr was not required to be put on a certain step within the pay range for animal caretakers. Full-time union employees, however, must be on a certain step within a pay range. Step raises are given automatically to those within full-time union positions but not to employees in part-time union positions. Further, the University's policies require it to apply its progressive discipline policy to full-time employees only.[3]

At the time she was hired, Kerr notified her supervisors that she had Crohn's disease but did not identify any other disabilities.[4] Indeed, Kerr requested a handicapped parking tag from the University, identifying Crohn's disease as the reason she need it. The only disabilities that

---

[2]In her response to the University's Statement of Uncontroverted facts, Kerr denied that "she never applied for a different job within OAR" because she said the cited deposition testimony that she gave did not support the statement. At the deposition, she was asked, "Is there any reason you didn't apply for a new job within OAR?" She replied, "There would have been no reason to." Kerr explained that many people were working and being paid at higher rates of pay doing the same job as she was. She testified that those certified as Assistant Lab Animal Technologists could do exactly the same job she was doing but with a higher rate of pay. When asked if all of these co-workers were full-time employees, Kerr said she assumed so based on her knowledge. Kerr also said that when she was hired, "Mr. Anthony" told her that as she "tested into higher grade" that she "would be given that pay scale." Kerr admitted, however, that she learned later that "Mr. Anthony told [her] something that . . . didn't exist."

[3]In her response to the University's Statement of Uncontroverted facts, Kerr denied all of these statements made concerning the differences between part-time and full-time employees. In support of these statements, the University offered the affidavit of Bonnie Gregg, a Senior Human Resources Manager with the University. In her denial, Kerr argues that Gregg's affidavit is not based on personal knowledge because "she does not connect these statements with any explanation of her competence to testify to them." In the affidavit, Gregg said that she was personally acquainted with the facts stated within the affidavit and that she had "personal knowledge of the human resources policies, practices, and procedures of the University of Missouri generally." Gregg's affidavit meets the standards for admissibility. Rule 74.04(e).

[4]In her response to the University's Statement of Uncontroverted facts, Kerr denied that she did not disclose any other disabilities. Kerr listed several ways in which she believed that she might have imparted constructive knowledge of these disabilities on the University. None of these, however, show that she disclosed any other disabilities to the University at the time of her hire. *See* discussion *infra* at pp. 16-22.

3

Weir and Douglas were aware that Kerr had were Crohn's disease and back problems.[5]  Kerr requested and received accommodations for her Crohn's disease by being allowed to miss work when sick and by being allowed to have frequent access to the bathroom during work hours.  She also requested and received accommodations for her back problems by having help lifting heavy items.  When asked whether she ever told any other supervisor or anyone at the OAR that she had depression, PTSD, or bipolar disorder, Kerr responded, "I never said anything to anyone because I thought the atmosphere for people with mental disease was not the same as the atmosphere for people with other physical problems."

On Friday, March 16, 2012, Kerr was at work and asked Malloy whether she could leave her dogs in her vehicle on the loading dock while she worked the next day.  The parties dispute exactly what Malloy said in response.[6]  Malloy testified that he told Kerr that he did not have a problem with it "if it was okay with [Douglas.]"  Kerr testified that Malloy "thought it would be okay."  When Malloy told Douglas what Kerr wanted to do, Douglas said "absolutely not."  Douglas sent an email to Kerr telling her not to bring her animals into the loading dock.

---

[5]In her response to the University's Statement of Uncontroverted facts, Kerr argued that Weir's and Douglas's deposition testimony was equivocal as to whether they had knowledge of Kerr's mental health disabilities.  Weir's and Douglas's testimony was not equivocal.  When asked if she was aware that Kerr had any disabilities, Weir said that she knew of Kerr's Crohn's disease and back problems and "nothing else."  When asked if she ever heard that aspects of Kerr's job caused Kerr anxiety, stress, or depression, Weir responded, "Not really, no."  Further, when asked if she was aware that Kerr had anxiety and other mental health concerns, Weir stated, "Not with any kind of formal medical information, no."  As for Douglas, when he was asked if he was aware that Kerr had any disabilities, Douglas said, "Crohn's disease is all I know. . . . [T]here at the end she had a back problem. . . . And that's all I know."  When asked if he was aware of any mental health issues or anxiety, Douglas responded, "No."  Kerr claimed that she told Douglas "right towards the end" or "right before" she was dismissed that she needed a "reasonable accommodation to continue working" because "the conditions under which [she] was working had become unbearable" and were making her "ill" and "sick."  Contrary to what Kerr asserts these statements by Kerr, however, did not put Douglas on notice about her mental issues, bipolar disorder, depression, or PTSD.

[6]This factual dispute is not material to summary judgment.

4

The next morning, Malloy found Kerr moving an OAR truck out of the loading dock. According to Malloy, Kerr "had parked her van outside—on the drive outside the loading dock and had gone inside and gotten the green [OAR] pickup truck and moved it around to the front of the building, so as to create room for her to move her van into the loading dock." Malloy told Kerr that she could not put her vehicle containing multiple dogs in the loading dock. Following this incident, Kerr's employment was terminated for "misconduct and insubordination." The termination letter said:

> Due to recent misconduct and insubordination in your interactions with the Supervisors of LAC (both Clayton Douglas and Tom Malloy), we are releasing you from your part-time employment with the University of Missouri and Office of Animal Resources.
>
> You had been instructed not to bring in your personal pets to the animal facility on Saturday, 3/17/12, (via an email on Friday, 3/16/12), however you brought them to work anyway, with the intention of bringing them into the facility. Had Tom not stopped you from pulling your van, fully loaded with crates of animals, into the dock, it could have posed a serious health issue within our research colonies and went against a direct order from your Supervisor not to do this. When Tom Malloy (Weekend Supervisor) instructed you not to continue to pull your vehicle into the dock, you then argued with him. Insubordination will not be tolerated at any time, especially when it concerns the health of our research animals.

Weir made the decision to terminate Kerr along with some input from Douglas, after considering information from Malloy. Dixon approved the termination.

Following her termination, Kerr filed a grievance and had a hearing before Karen Touzeau, Associate Vice Chancellor for Research for the University. Touzeau issued a written decision upholding the termination. Thereafter, on September 17, 2013, Kerr filed a third amended petition for damages, in which she alleged violations of the MHRA for age discrimination, religious discrimination, disability discrimination, and retaliation. The University moved for summary judgment on all counts, which the circuit court granted. Kerr

5

appeals from the circuit court's judgment granting summary judgment on her claims for age discrimination, disability discrimination, and retaliation.

Our review of a summary judgment is de novo. *ITT Commercial*, 854 S.W.2d at 376. We review the record in the light most favorable to the party against whom judgment was entered, and we afford that party the benefit of all reasonable inferences. *Id*. "The propriety of summary judgment is purely an issue of law." *Id*. We will affirm the circuit court's grant of summary judgment if no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *Id*. at 380; Rule 74.04. A "defending party" may establish a right to judgment by showing:

> (1) facts that negate any one of the claimant's elements facts [sic], (2) that the non-movant, after an adequate period of discovery, has not been able to produce, and will not be able to produce, evidence sufficient to allow the trier of fact to find the existence of any one of the claimant's elements, or (3) that there is no genuine dispute as to the existence of each of the facts necessary to support the movant's properly-pleaded affirmative defense.

*ITT Commercial*, 854 S.W.2d at 381 (emphasis omitted). As cautioned by the Missouri Supreme Court, "[s]ummary judgment should seldom be used in employment discrimination cases, because such cases are inherently fact-based and often depend on inferences rather than on direct evidence." *Daugherty v. City of Maryland Heights*, 231 S.W.3d 814, 818 (Mo. banc 2007). However, in considering summary judgment on an MHRA claim, the Court "must determine whether the record shows two plausible, but contradictory, accounts of the essential facts and the 'genuine issue' in the case is real, not merely argumentative, imaginary, or frivolous." *Id*. at 820. "Summary judgment should not be granted unless evidence could not support any reasonable inference for the non-movant." *Id*. at 818.

6

In her first point on appeal, Kerr asserts that the circuit court erred in granting summary judgment for the University because the court misstated and misapplied the elements of an MHRA age discrimination claim. Kerr claims that the circuit court erroneously required her to show disparate treatment based on age. Kerr asserts that a submissible MHRA age discrimination case does not require a showing of disparate treatment and that a plaintiff may prevail by showing "any unfair treatment" in employment in which consideration of age was a contributing factor.

"The MHRA protects persons aged 40 to 70 from age discrimination." *Daugherty*, 231 S.W.3d at 820 n. 8 (citing § 213.010(1), RSMo 2000). Section 213.055.1(1)(a), RSMo 2000, states that it shall be an unlawful employment practice for an employer "[t]o fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . age[.]" The MHRA defines discrimination, in part, as "any unfair treatment based on . . . age as it relates to employment[.]" § 213.010(5). "Nothing in this statutory language of the MHRA requires a plaintiff to prove that discrimination was a substantial or determining factor in an employment decision; if consideration of age . . . contributed to the unfair treatment, that is sufficient." *Daugherty*, 231 S.W.3d at 819. "Therefore, in enacting the MHRA, the legislature sought to prohibit any consideration of [age] no matter how slight in employment decisions." *McBryde v. Ritenour School Dist.*, 207 S.W.3d 162, 170 (Mo. App. 2006). Thus, if there is a genuine issue of material fact as to whether Kerr's age was a "contributing factor" in the University's decision regarding Kerr's employment, summary judgment is not proper. *Daugherty*, 231 S.W.3d at 820.

7

Kerr claims that the circuit court misstated and misapplied the elements of an MHRA age discrimination claim by requiring her to show disparate treatment based on age instead of focusing on whether age was a contributing factor in the University's alleged unfair treatment of her. Kerr, however, ignores the fact that she pled this case as one of disparate treatment. In the first count of her third amended petition, Kerr alleged:

> a. Plaintiff experienced unequal pay between herself and newly hired, younger employees with less education, work experience, and training.
>
> . . .
>
> d. Plaintiff has a college degree and over forty years of experience caring for animals, however Plaintiff's coworker Alan Yoder has no college degree but was hired a pay grade ahead of Plaintiff, even though he never tested for that pay grade.
>
> e. Younger employees were not terminated or investigated when complaints are made regarding their quality of work or unprofessional and improper behavior, whereas Plaintiff was. For example, Shannon Ragan, a male coworker of Plaintiff in his late twenties, was known to sleep during work hours, did not perform job duties, continuously used obscene language, was never investigated or reprimanded, and voluntarily resigned from employment with Defendant University. Also, Alan Yoder, another male coworker of Plaintiff in his late fifties, was reported to supervisors for inappropriate behavior on more than one occasion for kicking dogs and not letting dogs out of confinement to clean the dogs' runs. Yoder also loudly argued with supervisors in the presence of coworkers and is still employed by Defendant University.
>
> . . .
>
> g. Plaintiff complained many times to her supervisor about the disparity in pay and the unequal treatment she received, but her concerns were never addressed.

Thus, Kerr was claiming that her age was a contributing factor in the University's alleged unfair treatment of her as shown by the disparate treatment between herself and other employees. "'[I]nstances of disparate treatment,' that is, when the employee has been treated differently from other employees, 'can support a claim of' discrimination under the MHRA." *McGhee v.*

*Schreiber Foods, Inc.*, No. WD78744, 2016 WL 4198580, at * 6 (Mo. App. W.D. Aug. 9 2016) (quoting *Williams v. Trans States Airlines, Inc.*, 281 S.W.3d 854, 873 (Mo. App. 2009) and *Young v. Am. Airlines, Inc.*, 182 S.W.3d 647, 654 (Mo. App. 2005)). But, where a plaintiff attempts to prove her case based upon disparate treatment, "'the plaintiff bears the burden of establishing that the employees are similarly situated in all relevant respects.'" *McGhee*, 2016 WL 4198580 at *6 (quoting *Williams*, 281 S.W.3d at 873, and *Young*, 182 S.W.3d at 654). Thus, Kerr's contention that the circuit court erroneously required her to show disparate treatment based on age instead of focusing on whether age was a contributing factor in the University's alleged unfair treatment of her is without merit. The circuit court never stated that Kerr had to establish disparate treatment to prevail on any MHRA claim. The circuit court was merely analyzing Kerr's discrimination claims under the theory of discrimination that she pled.

"[A] disparate treatment plaintiff must show 'that he or she was treated differently from similarly situated members of the unprotected class.'" *Cox v. Kansas City Chiefs Football Club, Inc.*, 473 S.W.3d 107, 119-120 (Mo. banc 2015) (citation omitted.) "[T]he plaintiff must prove that the motivating distinguishing factor leading to the more severe [employment action] was his or her membership in the protected group." *Id*. at 120. "In such 'disparate treatment' claims, the relevance of evidence as to the treatment of coworkers depends on whether those coworkers were otherwise similarly situated to the plaintiff." *Id*. at 119. "In determining whether coworkers were 'similarly situated,' courts analyze factors including whether the same supervisor imposed the discipline, whether the coworkers were subject to the same standards, whether they engaged in conduct of similar seriousness, and similar factors." *Id*. To be similarly situated, coworkers do not have to be "identical in every conceivable way," but the distinctions

between them must not be "so significant that they render the comparison effectively useless[.]" *Id*. at 123 n.14 (internal quotation marks and citation omitted).

In its disparate treatment analysis, the circuit court merely found that Kerr did not identify co-workers who were outside the protected class but who were otherwise similarly situated to Kerr and treated more favorably. Indeed, the employees Kerr compared herself to were not similarly situated. Kerr was the only part-time employee, and the younger employees that Kerr compared herself to were full-time union employees subject to the union provisions for pay scales, step raises, and progressive discipline. Although the younger employees may have performed similar duties, they were not subject to the same standards for pay scales, raises, or disciplinary procedures. These distinctions are "so significant to render the comparison effectively useless[.]" *Id*. (internal quotation marks and citation omitted).

Moreover, no admissible evidence exists in the record to support that Kerr's factual allegations about these employees are even true. In response to summary judgment, Kerr cannot assert that these allegations are true by merely relying on her pleadings, given that the University has denied those allegations in its answer to Kerr's petition and the University has not admitted these facts. Rather, Kerr has to come forward with actual admissible evidence from "discovery, exhibits, or affidavits" in support of her allegations. Rule 74.04(c)(2).

In her third amended petition, Kerr also alleged that her age was a contributing factor in the University's alleged unfair treatment of her in that:

> b. Plaintiff has always been compensated as an entry-level employee, despite having tested successfully for a higher pay grade.

> c. Plaintiff was never given a step raise or a raise based on successful pay-grade testing during the 15 years she was employed by Defendant University.

In support of these alleged facts, Kerr relies on her deposition testimony in which she testified that when she was hired she had a "verbal contract" with "Mr. Anthony" that as she "tested into higher grades" that she "would be given that pay scale." Kerr fails to point out, however, that she also testified that "Mr. Anthony told [her] something that [she] was later told . . . didn't exist." Thus, Kerr admitted that although "Mr. Anthony" told her that she would receive the higher pay scales as she tested into higher grades, she knew that such an arrangement "didn't exist."

Further, in its statement of uncontroverted facts for its motion for summary judgment, the University stated: "Step raises are given automatically to employee in full-time employees in full-time union positions but not to those in part-time positions." In support of this statement, the University provided the affidavit of Bonnie Gregg, a Senior Human Resources Manager with the University. In the affidavit, Gregg stated:

> 7. Full-time employees in union positions must be on a certain step within the pay range.
>
> 8. Part-time employees in union positions are required to be paid within the pay range, but are not required to be on a certain step within the pay range.
>
> 9. Step raises are given automatically to employees in full-time union positions but not to employees in part-time union positions.

In her response to the University's Statement of Uncontroverted facts, Kerr argued that Gregg's affidavit failed "to show affirmatively that the affiant is competent to testify on this matter." Kerr contended that "Gregg does not specify to which employees her statement applies, in that her statement is not restricted to employees of LAC or OAR and refers generically to 'employees in full-time union positions' and 'part-time employees.'" Kerr claims that Gregg's

11

affidavit is not based on personal knowledge because "she does not connect these statements with any explanation of her competence to testify to them."

In the affidavit, Gregg said that she was personally acquainted with the facts stated within the affidavit and that she had "personal knowledge of the human resources policies, practices, and procedures of the University of Missouri generally." She stated that she was a "Senior Human Resources Manager" with the University since April 13, 2014, and that, prior to that time, she was a Manager of Human Resources Support Services for the University since September 1, 2001. Gregg stated that as Senior Human Resources Manager, she had access to the official personnel records of the OAR. Gregg's affidavit met the standards for admissibility. Rule 74.04(e). Thus, Kerr's denial of the University's statement of uncontroverted fact that step raises are not given automatically to part-time employees does not create a genuine issue of fact precluding summary judgment. To controvert this fact, Kerr had to provide "specific references to the discovery, exhibits or affidavits that demonstrate specific fact showing that there is a genuine issue for trial." Rule 74.04(c)(2). Nothing in the record, therefore, established that the University was required to give a part-time employees a step raise or a raise based on successful pay grade testing.

In her final[7] contention in her third amended petition in regard to age discrimination, Kerr alleged that her age was a contributing factor in the University's unfair treatment of her in that her supervisor, "Lonny Dixon, referred to [her] as, "an uppity old woman.'" We deal with this

---

[7]Kerr also alleged generally that her "termination was in part motivated by [her] age" and that the University "had no legitimate, non-discriminatory, and credible explanation for its treatment of [her]." Kerr fails to support these allegations with evidence from the record. Rule 74.04(c)(2) requires that a response to a motion for summary judgment "shall support each denial with specific references to the discovery, exhibits or affidavits that demonstrate specific facts showing that there is a genuine issue for trial." Kerr cannot survive summary judgment merely by citing her own petition and conclusory opinions.

contention in conjunction with Kerr's second point on appeal, in which she contends that she demonstrated genuine disputes of material fact on her age discrimination claim because she produced deposition testimony showing that a supervisor referred to her as "an uppity old woman" around the same time she had inquired about why she had not received a raise and that the same supervisor later approved her termination. Kerr argues that such evidence is sufficient for a jury to infer that her age was a contributing factor in her not receiving a raise and in her termination.

In regard to the "uppity old woman" comment, the following exchange occurred in Kerr's deposition testimony:

> Q. Okay. In your petition you allege that Dr. Dixon called you an uppity old woman. Do you remember saying that?
>
> [Kerr:] I remember putting it in my petition.
>
> Q. Okay. Do you know when he said that?
>
> A. No.
>
> Q. Okay.
>
> A. I got it secondhand.
>
> Q. Okay. And in your discovery responses, you were asked to describe it. And you said, Clayton Douglas informed plaintiff that Lonnie Dixon had referred to plaintiff as an uppity old woman. Does that sound—
>
> A. Yes. That's exactly how it happened.
>
> Q. So you never heard that comment yourself?
>
> A. I heard it from Clayton.
>
> . . .
>
> Q. Okay. When was it that Clayton told you that?

13

A. It was at—when I was at work, because I didn't see Clayton—I mean, I saw Clayton once in a while out of work but not very often. So it had to be in the office, slash, break room. And I think it was during a time that I was asking him why I didn't get my pay increase when I passed my ALAT.

Q. Okay. And he said what?

A. I don't remember exactly how the context of Dixon came up.

Kerr testified that Clayton told her that Dixon made this comment, and she admitted that she did not hear the comment firsthand. Thus, the comment that Kerr was an "uppity old woman" is double hearsay. Generally, "[h]earsay statements that would be inadmissible at trial are not competent to support a motion for summary judgment." *Jones v. Landmark Leasing, Ltd.*, 957 S.W.2d 369, 376 (Mo. App. 1997). Further, "a hearsay statement contained within other hearsay evidence is admissible only where both the statement and the original hearsay evidence are within exceptions to the hearsay rule." *Killian Const. Co. v. Tri-City Const. Co.*, 693 S.W.2d 819, 835 (Mo. App. 1985).

Kerr contends that the statement from Douglas about what Dixon allegedly said to Douglas is not hearsay because it was an "admission by a party." In support of her contention, Kerr relies on *Bynote v. National Super Markets, Inc.,* 891 S.W.2d 117 (Mo. banc 1995). In *Bynote*, the plaintiff slipped and fell on a puddle of liquid on the store floor. *Id*. at 119. When a uniformed grocery bagger asked her if she was okay, the plaintiff said that a checker came around the cash register and said to the bagger, "'I told you to get that water up.'" *Id*. at 120. When the bagger said that he had, the plaintiff said that the checker replied, "'I can see the suds from here.'" *Id*. On appeal, the store argued that the testimony from its employees were inadmissible hearsay. The Missouri Supreme Court, however, concluded that "an admission of an agent or employee . . . may be received in evidence against his principal, if relevant to the

14

issues involved, where the agent, in making the admission, was acting within the scope of his authority[.]" *Id*. at 124 (citations and internal quotation marks omitted). The *Bynote* court, therefore concluded that the statements of the bagger and checker were admissible as vicarious admissions of its employer. *Id*.

At issue in *Bynote* was the checker's and bagger's own statements. In contrast in this case, Kerr seeks to admit her recollection of Douglas's recitation of Dixon's statement. *Bynote* states that an employee's own statement can be an admission attributable to the employer in some circumstances; it does not state that an employee's statement of what another person said can be an admission attributable to the employer.

Moreover, to invoke the "admission of a party" exception to the hearsay rule, Kerr was required to lay the foundation to show that the duty to communicate with others about what Dixon said was within the scope of Douglas's responsibilities. *See Peterson v. Progressive Contractors, Inc.*, 399 S.W.3d 850, 870-71 (Mo. App. 2013). Kerr makes the conclusory statement that Douglas was acting within the course and scope of his agency, but she cites nothing in the record that supports this conclusion. Thus, Kerr failed to meet her burden that the admission of a party exception applies.

Kerr also contends that her statement concerning Dixon's comment to Douglas was not offered to prove the truth of the matter asserted—that she was an "uppity old woman"—but was offered as evidence of Dixon's discriminatory state of mind and that he considered her age around the time that he participated in adverse employment decisions regarding her. "[U]nder the state of mind exception to the hearsay rule, a contemporaneous statement relating to a person's existing intent may be admitted to prove the person actually had such intent, if intent is a relevant issue in the case." *Coon v. Am. Compressed Steel, Inc.*, 207 S.W.3d 629, 635 (Mo.

15

App. 2006). Kerr readily admitted in her deposition testimony that she had no idea when Dixon made the "uppity old woman" comment. She also failed to establish what the context was when Dixon made the context. Thus, it is impossible for us to conclude that Dixon's comment was a contemporaneous statement relating to a Dixon's existing intent. Indeed, without explanations of when the statement was made, what the context was when Dixon made the comment, and why Dixon made the comment, the comment "uppity old woman" standing alone is not a statement of intent that would reflect on Dixon's then existing state of mind. The comment, therefore, is inadmissible hearsay and cannot be used to refute summary judgment.

The circuit court did not err in granting summary judgment to the University on Kerr's claim for age discrimination. No genuine issues of material fact remained as to Kerr's age discrimination claim as alleged in her petition, and the University was entitled to judgment as a matter of law.

In her third point, Kerr contends that the circuit court erred in granting summary judgment in favor of the University because she demonstrated a genuine dispute of material fact on her disability discrimination claim. Kerr claims that she produced evidence sufficient for a jury to find that the University had either actual or constructive notice of her mental disabilities and that consideration of her disabilities contributed to the University's adverse employment action against her. We disagree.

As with age discrimination, the MHRA makes it unlawful for an employer to discharge an individual or discriminate against any individual with respect to her compensation because of such individual's disability. § 213.055.1(1)(a). A claim of disability discrimination requires the plaintiff to show that (1) she is legally "disabled;" (2) she was discharged or discriminated against with respect to her compensation; (3) and that the disability was a factor in the decision

16

to discharge her or in the compensation decision. *See DeWalt v. Davidson Service/Air, Inc.,* 398 S.W.3d 491, 499 (Mo. App. 2013). Section 213.010(4) defines the term "disability" as a "physical or mental impairment which substantially limits one or more of a person's major life activities, being regarded as having such an impairment, or a record of having such an impairment, which with or without reasonable accommodation does not interfere with performing the job." Thus, "to be disabled under the MHRA, a person must have an impairment that limits a major life activity and with or without reasonable accommodation that impairment must not interfere with performing a job." *Medley v. Valentine Radford Comms., Inc.*, 173 S.W.3d 315, 320-21 (Mo. App. 2005). "An employer must make reasonable accommodations to the *known* limitations of a disabled employee . . ., including making the facilities accessible and usable and job restructuring or part-time or modified work schedules." *Lomax v. DaimlerChrysler Corp.*, 243 S.W.3d 474, 480 (Mo. App. 2007) (citation and internal quotation marks omitted) (emphasis added).

In regard to Kerr's disability discrimination claim, the issue in this case is whether a genuine issue of material fact remains as to whether the University was on notice of Kerr's mental disabilities. The record establishes that Kerr had bipolar disorder, post-traumatic stress disorder, attention deficit disorder, and depression. Kerr also had two physical disabilities, Crohn's disease and spinal stenosis, which are not the basis of any claim in her lawsuit. When asked in discovery interrogatories to identify who at the University she informed she was disabled and what disability she reported, Kerr answered:

> When Plaintiff was hired in 1997 she informed both the Facilities Manager Leroy Anthony, as well as her supervisor, Jane Robinson, that she was a disabled worker. Plaintiff reported having Chron's [sic] Disease and requested accommodations from time to time regarding this illness.

17

Kerr did not answer that she had informed the University of any other disabilities. In her deposition testimony, Kerr testified, "I know I never mentioned any of my mental illness [sic] to my supervisor[.]" She later confirmed, "I never said anything to anyone" at OAR about mental illnesses.

Kerr did testify that she thought "right towards the end" before she was dismissed she told Douglas about her mental illnesses. She was then asked:

> Q. Okay. Well, who did you tell right before you were dismissed?
>
> A. Clayton.
>
> Q. Okay. And you told him about all these things[--depression, ADD, bipolar and PTSD]?
>
> A. I don't think I made a list. I just said the conditions under what I— what I was working—the conditions under which I was working had become unbearable, and I needed reasonable accommodation to be able to continue working. That what was happening was making me more ill. . . . .
>
> . . .
>
> Q Okay. And you said that, I don't think I made him a list. And then you said the conditions had become unbearable and I needed an accommodation. So did you identify for him what these conditions were?
>
> A. You mean what my illness was?
>
> Q. Yes.
>
> A. No.
>
> Q. Did you tell him that it was a mental issue?
>
> A. I don't remember if I said that specifically.
>
> Q. Okay.
>
> A. I—I do tell—remember saying that it was making me sick.
>
> Q. Okay.

18

A. At—but I think that was the reference was illness.

Kerr's answer to interrogatories and her deposition testimony show that she never directly informed the University of any of her mental illnesses.

Kerr contends, however, she produced evidence that the University had constructive notice of her mental disabilities regardless of whether she explicitly identified them. In particular, Kerr relies on her answer to interrogatories, her deposition testimony, and her affidavit. First, Kerr points to her deposition testimony in which she described symptoms she experiences:

Q. What kind of symptoms do you experience with the PTSD?

A. I'm frightened of people. . . . I startle easily. If someone comes up behind me or if someone's walking in a room and I'm focused on a task, if I suddenly notice them there, I look like a deer in headlights. . . . I react—I react oddly sometimes to things that people do or say.

Second, she points to her deposition testimony where she told Douglas that she needed "reasonable accommodation" to continue working because "what was happening was making [her] more ill." Third, in her interrogatories and in her deposition testimony, she said that she complained that some of Douglas's emails "exacerbated the anxiety and stress caused by her disabilities" and that, after "each such occasion," she would request that Douglas explain the emails or inform her of his concerns at a time when she and Douglas could have an immediate conversation about them. Finally, in her affidavit, Kerr said that, when she was called in for the meeting with Weir and Douglas at which she was terminated, she requested the presence of a community support worker. She said that she had an established relationship with a community support worker to assist her in coping with daily activities due to her depression, bipolar disorder, ADD, PTSD, stress, and anxiety. Kerr said that Douglas and Weir continued on with

19

their meeting without the presence of her community support worker. Kerr contends that all of this evidence was sufficient evidence for a jury to find that the University was on notice of her mental disabilities.

Although Kerr may have established that she is "frightened of people," startles easily, "react[s] oddly sometimes to things that people do or say," and sometimes looks "like a deer in headlights," such are not the kind of symptoms that would put an employer on constructive notice of a disability. As noted by the Nebraska Supreme Court, mental disabilities "are rarely open, obvious, and apparent." *Doe v. Board of Regents of Univ. of Nebraska*, 846 N.W.2d 126, 147 (Neb. 2014). "Knowledge of limitations or symptoms does not necessarily prove that the defendant knew the condition or symptoms were disabling, and this is especially true for many mental disabilities." *Id*. Thus, the *Doe* court concluded in a suit alleging discrimination in violation of the American with Disabilities Act and the Rehabilitation Act that "mere knowledge that the plaintiff had requested time off to deal with stress or depression was insufficient to prove knowledge of a mental disability." *Id*.; *see also Kobus v. College of St. Scholastica, Inc.*, 608 F.3d 1034, 1037 n.3 (8th Cir. 2010) ("Like depression, 'stress and anxiety' are conditions with many variations. Complaining of stress and anxiety is not enough to put an employer on notice of a serious health condition" for the purposes of the Family and Medical Leave Act). The symptoms that Kerr claims that she exhibited are not enough to put an employer on notice that she suffered from a mental illness that qualified as a disability.

Further, Kerr's request of Douglas for a reasonable accommodation because "what was happening was making [her] more ill" would not have put the University on notice that Kerr suffered from a mental illness that qualified as a disability. In fact, Kerr said that she chose not to make Douglas aware of her mental disability. Moreover, although Kerr complained that some

20

of Douglas's emails "exacerbated the anxiety and stress cause by her disabilities" and that, after "each such occasion," she would request that Douglas explain the emails or inform her of his concerns at a time when she and Douglas could have an immediate conversation about them, such complaints did not put the University on notice that Kerr suffered from a mental illness that qualified as a disability. Kerr recalled three "stressful" emails from Douglas and testified that the emails were stressful because they did not give her complete information, were not specific, and were sent during times that she wasn't working. Although Malloy testified that Kerr "did mention to Douglas on one occasion not to email her on her days off" because "it ruined her weekend," a statement that emails "ruined her weekend" is not the type of statement that would create constructive notice of a disability.

Finally, as to her request for a "community support worker" at the termination meeting, the only "evidence" about the reasons for her need of a community support worker comes from Kerr's affidavit. In the affidavit, Kerr stated:

> 3. On March 21, 2010, Affiant requested the presence of a community support worker at a meeting with Dana Weir and Clayton Douglas at the University of Missouri concerning Affiant's employment at the University of Missouri.
>
> 4. Affiant requested the presence of the community support worker for the purpose of supporting and assisting Affiant during that meeting.
>
> 5. As of the time of that meeting Affiant had an established relationship with a community support worker.
>
> 6. The reason Affiant had established a relationship with a community support worker was that Affiant's depression, bipolar disorder, attention deficit disorder and post-traumatic stress disorder caused Affiant to feel the need for the assistance of the community support worker to cope with daily activities.
>
> 7. The daily activities for which Affiant felt the need of a community support worker included coping with work stress and anxiety.

21

While Kerr may have known why she requested the community support worker, there is nothing in the record that would impute that knowledge to the University.

Because there is no evidence that the University was aware of Kerr's mental disabilities, Kerr cannot establish that a mental disability was a contributing factor in the University's decision not to give her a raise or in the University's decision to terminate her. The circuit court, therefore, did not err in granting summary judgment in favor of the University.

In her final point on appeal, Kerr contends that the circuit court erred in granting summary judgment in favor of the University because the court misstated and misapplied the law when it found that summary judgment on her MHRA discrimination claims caused her retaliation claim to fail as a matter of law. Kerr claims that her retaliation claim remained viable as long as she had a reasonable, good faith belief that there were grounds for a claim of discrimination.

Section 213.070(2), RSMo 2000, provides: "It shall be an unlawful discriminatory practice . . . [t]o retaliate or discriminate in any manner against any other person because such person has opposed any practice prohibited by this chapter[.]" To establish a claim for retaliation, the employee must prove: (1) that she complained of discrimination; (2) that the employer took adverse action against her; and (3) that the complaint and the adverse action are causally related. *Shore v. Children's Mercy Hosp.,* 477 S.W.3d 727, 735 (Mo. App. 2015). "The complaint of discrimination does not have to involve actual discrimination for a retaliation claim to stand." *Id*. "'In general, as long as a plaintiff had a reasonable, good faith belief that there were grounds for a claim of discrimination or harassment, the success or failure of a retaliation claim is analytically divorced from the merits of the underlying discrimination or harassment claim.'" *Id*. (citation omitted).

22

Although Kerr claims that the circuit court misstated and misapplied the law when it found that summary judgment on her MHRA discrimination claims caused her retaliation claim to fail as a matter of law, we note that the circuit court specifically found that Kerr "identified no protected activity that could qualify for her retaliation claim." Kerr claims, however, that she produced evidence identifying a protected activity supporting her retaliation claim. In particular, she points to her deposition testimony in which she complained "right towards the end" or "right before" she was dismissed and asked Douglas for "reasonable accommodation" because the conditions she was working under had become unbearable and was making her more ill. She told Douglas that, "if he wouldn't take action, I was going to have to take it higher up the chain," to which Douglas asked Kerr if she was threatening him. Kerr claims that, because Douglas had input into the decision to terminate her and was present at the termination meeting, this evidence was sufficient for a jury to infer that her complaint to Douglas was a contributing factor in the decision to terminate her.

The problem is that Kerr pled her retaliation claim as a claim where the "protected activity" about which she complained was "discriminatory" and "harassing" behaviors of her supervisor and co-workers. She did not allege in her petition that a request for an accommodation was the "protected activity" underlying her claim for retaliation.[8] In regard to her retaliation claim, Kerr alleged:

> 50. Plaintiff reasonably believed Douglas and her coworkers' behavior violated University policy and the MHRA when Plaintiff made good faith reports to her supervisors of the discriminatory conduct of Douglas and her coworkers.

---

[8]The same is true in regard to Kerr's contentions that she produced evidence sufficient for a jury to infer that the reason the University gave for her termination was a pretext. Kerr fails to explain, however, how these alleged pre-textual reasons relate to her claim for retaliation under the Missouri Human Rights Act and she does not mention the pre-textual reasons in her pleadings in regard to her claim for retaliation.

51. Plaintiff complained of her supervisor's and coworkers' discriminatory actions and behavior to her supervisors on a number of occasions, including two weeks before she was terminated. However, no action was taken in regards to addressing any [of] Plaintiff's complaints.

52. About one month prior to Plaintiff's termination, Plaintiff asked her supervisor, Clayton Douglas, to stop his and her coworkers' harassing behavior or Plaintiff would report Douglas's and her coworkers' behavior to Douglas's supervisors. Douglas responded to Plaintiff's complaint by asking her, "Are you threatening me?"[9]

"The trial court's authority is limited to such questions as are presented by the parties in their pleadings." *McClain v. Hartley*, 320 S.W.3d 183, 185 (Mo. App. 2010). Moreover, our review of a grant of summary judgment "is limited to those issues raised in the trial court, and this court will not review or convict a trial court of error on an issue that was not put before the trial court to decide." *Grillo v. Global Patent Group LLC*, 471 S.W.3d 351, 357 (Mo. App. 2015). Given that Kerr did not plead her claim of accommodation as the protected activity to support her retaliation claim and given that Kerr does not complain about the circuit court's granting summary judgment based on the theory pled, we conclude that the circuit court did not err in granting summary judgment for the University on Kerr's retaliation claim.

## Conclusion

The circuit court did not err in granting summary judgment in favor of the University on Kerr's claims for age discrimination, disability discrimination, and retaliation. We, therefore, affirm the circuit court's judgment.

/s/ JAMES EDWARD WELSH
James Edward Welsh, Judge

All concur.

---

[9]Kerr now contends that Douglas asked her if she was threatening him when she asked Douglas for accommodations because conditions at work were making her ill.

24