

# In the Missouri Court of Appeals Eastern District

## DIVISION TWO

CHARLOTTE MOORE, )
                      )
            Appellant, )
                      )
vs. )
                      )
SOUTHWESTERN BELL TELEPHONE )
COMPANY, ET AL., )
                      )
            Respondents. )

No. ED111470

Appeal from the Circuit Court
of St. Louis County

Honorable John N. Borbonus

FILED: December 19, 2023

## Introduction

Charlotte Moore ("Moore") appeals from the circuit court's summary judgment and dismissal of her claims of workplace discrimination under the Missouri Human Rights Act ("MHRA"). In her first four points on appeal, Moore challenges the circuit court's grant of summary judgment in favor of Southwestern Bell Telephone Company ("SWBT") and its employees Johnny Soliz ("Soliz") and Jacobie Jones ("Jones") (collectively, "Respondents"). Moore argues the circuit court erred in granting summary judgment to Respondents because the record contained sufficient evidence that race, disability, and complaints of discrimination were contributing factors to her termination and supported her claims of hostile work environment. In her final point on appeal, Moore argues that when the circuit court denied her partial-summary judgment motion against former SWBT employee Sharon Hyche ("Hyche"), the circuit court erred in granting final judgment to Hyche because Moore's claims against her were not

precluded by res judicata or collateral estoppel in that there had been no previous lawsuit involving Hyche. The summary-judgment record contains no evidence that a genuine dispute of material fact exists showing that Moore's race, disability, or complaints of discrimination were contributing factors to her termination. Accordingly, the circuit court did not err in entering summary judgment on her claims of racial discrimination, disability discrimination, retaliation, and hostile work environment against Respondents, and we deny the first four points. However, because we can find no authority for a circuit court to grant judgment to a non-movant in summary-judgment proceedings, the circuit court erred in entering final judgment as to Hyche. Accordingly, we affirm the circuit court's judgment as to Respondents, reverse as to Hyche, and remand the case for further proceedings.

Factual and Procedural History

## I.      Procedural History

SWBT employed Moore as a service representative between December 3, 2003 and May 2, 2017. After SWBT terminated her employment, Moore filed a Charge of Discrimination with the Missouri Commission on Human Rights. On September 26, 2018, Moore filed a Petition in the circuit court against Hyche, Moore's primary supervisor who was no longer employed by SWBT at the time of filing, and Respondents. In her petition, Moore alleged the following claims under the MHRA: racial discrimination, disability discrimination, retaliation, and hostile work environment based on race, disability, and retaliation. Moore alleged that Soliz, Jones, and Hyche acted directly in the interests of SWBT in their capacity as supervisors. Initially, Respondents and Hyche were all jointly represented, then the circuit court entered an order permitting Respondents' counsel to withdraw from representing Hyche because she refused to communicate or cooperate. Hyche proceeded in the action unrepresented. Moore served Hyche with requests for admissions, to which Hyche did not respond.

2

Respondents moved for summary judgment on all counts in the Petition. Respondents argued the uncontroverted facts established that Moore's race, alleged disability, and alleged protected activities were not factors in any adverse employment action or hostile work environment. Respondents maintained that Moore's performance repeatedly fell short of objective expectations and that, after several steps of progressive discipline, SWBT terminated her employment for violating company policy when handling customer calls.

## II.     Summary-Judgment Record

The following facts summarize the relevant portions of the summary-judgment record:

### A.     SWBT policies

SWBT maintained a policy prohibiting discrimination and harassment based on any class protected by law ("EEO Policy") and a Code of Business Conduct ("COBC") setting forth a policy for employee ethics and requiring employees to treat customers and other employees with respect and professionalism. SWBT trained Moore on the EEO Policy and COBC. Moore's role as a service representative was to handle customer inquiries and complaints, including assisting customers requesting to disconnect service, and to retain customers and promote SWBT's products and services. As a member of the Communication Workers of America Union (the "Union"), the terms and conditions of Moore's employment were governed by a collective bargaining agreement ("CBA") between the Union and SWBT. The CBA provided that supervisors may monitor and assess service representatives' calls with customers. SWBT assessed performance of service representatives using various metrics on a scorecard, including customer surveys. Supervisors regularly coached service representatives on performance and were authorized to place poorly-performing service representatives on a Performance Improvement Plan (a "PIP"), a policy of corrective action that includes four progressive steps: a Performance Notice, a Written Reminder, Decision Making Leave ("DML"), and, ultimately,

3

Termination. If DML was interrupted by another form of leave, it was SWBT's policy to automatically extend the DML to account for that time.

      B.     Moore's Performance Notice, Return to Hyche's Team, and First Complaint to Jones

Between 2003 and 2010, Hyche was Moore's direct supervisor. Hyche's supervisor was center sales manager Jones, and Jones's supervisor was general manager Soliz. Between 2010 and 2014, Moore's direct supervisor was Corey Hill ("Hill"). Moore, Hyche, Hill, and Jones are African American, and Soliz is Hispanic.

Hill testified that Moore was one of the more consistent and top-performing service representatives on his team, which had average performance overall. However, Hill noted Moore had poor customer survey satisfaction scores. Hill explained that poor customer surveys are one of the weighted metrics on an employee's scorecard that can result in disciplinary measures. Hill placed Moore on a PIP in July 2012 in order to improve her customer survey satisfaction scores. Hill subsequently issued Moore a Performance Notice for customer survey results in January 2013. Moore did not recall receiving the PIP or Performance Notice but recalled discussing with Hill how she needed to improve her customer survey scores.

Moore returned to Hyche's team in 2014. In March 2015, SWBT's National Observation Team documented an incident in which Moore ran a credit check on a customer without first obtaining the customer's permission, which violated regulatory requirements and SWBT policy. The National Observation Team referred the incident to Hyche, who met with Moore to confirm Moore knew the credit check guidelines. Moore indicated she understood the guidelines but said they slipped her mind on that occasion, and Hyche advised Moore that failure to follow the guidelines could lead to disciplinary action. In April 2015, Hyche met with Moore and a Union representative to discuss Moore's compliance with training on opening and closing statements

4

during calls. Hyche agreed to deactivate Moore's earlier Performance Notice and to refrain from issuing the next step of a Written Reminder so long as Moore met or exceeded customer service expectations, and Moore agreed to meet those expectations.

In May 2015, Moore met with Jones and requested to be transferred to another team. Moore told Jones that Hyche was "micromanaging" her and listening to all her calls. Jones replied that SWBT would not move her from one team to another simply because her supervisor was listening to her calls because that is what a supervisor is supposed to do. In her deposition, Moore initially testified that she did not tell anyone at SWBT that she was racially discriminated against. Moore then clarified that she "probably told [Jones] . . . [she] did tell him that . . . [Hyche] treated black people terrible, that's—black women in particular."

C.      Moore's Written Reminder

On April 19, 2016, Hyche placed Moore on a Written Reminder for nine months due to unsatisfactory customer survey scores. Hyche met with Moore and a Union representative and informed Moore that she needed to improve her customer survey scores to avoid further disciplinary action.

D.      Moore's Second Complaint to Jones, DML, Medical Leave, and Hotline Calls

In May 2016, Moore again asked Jones if she could be transferred to a different team. Neither Moore nor Jones recalled the specifics of her request. Jones remembered speaking twice with Moore about Hyche micromanaging her, and Moore testified she told Jones that Hyche was harassing her and listening to her calls.

That same month, SWBT found through routine call-monitoring that Moore violated COBC policy by placing three different customers on long holds and transferring two of those calls to another department without providing an explanation to the customer. Hyche conducted an investigatory meeting with Moore and a Union representative in which she reviewed the

5

COBC policies and explained how Moore's recent calls violated them. Hyche reviewed Moore's job responsibilities, including SWBT's expectations for how long customers could be placed on hold and how to provide warm transfers. Moore confirmed she understood SWBT's policies. Hyche asked Moore when it is proper to "warm transfer" a customer, and Moore did not know and did not recall having been trained on the practice. Hyche and Moore listened to and reviewed the three flagged customer calls, and Hyche explained how Moore's behaviors during the calls were violations of COBC policy regarding work avoidance and customer mistreatment, which were grounds for discipline.

Hyche proceeded to place Moore on twelve months of DML, which Moore began on June 2, 2016. At the DML meeting, Moore indicated that she wanted to continue her employment and was committed to meeting all expectations. Hyche advised Moore than any further policy infractions could lead to more disciplinary action, including termination, and she asked Moore if there was anything else Moore needed in order to be successful, to which Moore said no. Moore later testified that she believed Hyche placed her on DML as retaliation for asking Jones to move her to a different supervisor.

### 1. Moore's Two Hotline Calls While on Leave

SWBT maintained an Ethics Hotline for internal complaints. Moore made two Ethics Hotline calls about Hyche while she was on leave. In her first call in June 2016, Moore stated Hyche had been harassing her since June 2015 by "excessively monitor[ing]" her. Moore stated that Hyche would take lunches and breaks at the same time as her. Moore reported that Hyche warned Moore she would listen to Moore's calls and write-up Moore if Moore's numbers were not up to par. Moore said that Hyche once met with her without a Union representative present and told Moore she had a bad attitude towards her and that Moore should consider getting a new job. Moore commented that a "lot of employees [on Hyche's team] are out on stress" because of

6

Hyche's management. Moore reported that she twice requested Jones transfer her to another team due to Hyche's management and expressed her belief that Hyche retaliated against her for speaking to Jones. Moore stated she felt stressed because Hyche "created a hostile work environment for her." Moore noted that Hyche put her on a DML for twelve months for poor customer service, and she asked to have the DML removed and to be transferred from Hyche's team.

Moore testified that following her June 2016 hotline call, she took an approved Family and Medical Leave Act ("FMLA") leave of absence due to stress from working on Hyche's team. Moore did not recall whether she informed Jones that she took leave due to stress from working on Hyche's team.

Moore again contacted the Ethics Hotline in September 2016, reporting the same concerns. The Ethics Hotline investigator contacted Hyche and told her to excuse Moore from regular work duties to participate in an investigation. However, after Moore indicated she was absent from work for illness, the investigator determined that Moore was currently on leave. The investigator reviewed SWBT's FMLA and Disability Claim Status and found that Moore had initiated a disability claim earlier that month on September 8, 2016. The investigator's report did not contain any additional information about the nature of that claim. The investigator indicated that further investigation into Moore's complaints was halted because Moore reported that she was on leave. The investigator advised Moore to call back when she returned to work, as SWBT's policy is to refrain from asking employees on leave to participate in work activities, including investigations.

### 2. Moore's Return to Work and Third Hotline Call

Moore returned to work intermittently in November 2016. Moore requested additional help to reacclimate to her job duties, which SWBT provided. For example, Hyche approved

7

Moore's request to sit with other service representatives for three weeks to relearn proper job performance.

Moore made a third Ethics Hotline call in February 2017, reporting that Hyche's behavior towards her had worsened since she returned to work. In her deposition, Moore stated she believed that Hyche's increased harassment during this time was retaliation for Moore complaining about her to Jones and to the Ethics Hotline. In her hotline call, Moore reiterated the same complaints about Hyche's management as she did in her prior hotline calls, stating that Hyche was targeting her and excessively monitoring her. Moore said that Hyche harassed her by being "very nitpicky." Moore reported that Hyche was micromanaging Moore's handling of customer disconnect calls. Moore stated Hyche was also monitoring her when she left her desk, including her restroom use, and was commenting on her clothes. Moore said that Hyche had been with the company for many years and was one of the most successful supervisors in terms of sales but was "very controlling." Moore acknowledged that her performance had not been the best and that she had just returned from DML as a disciplinary measure. Moore stated she felt the DML was unfair and should have been removed. Moore said that if she could not be transferred to another team, she did not want Hyche investigated because she feared Hyche would retaliate against her. Multiple investigators spoke with Moore about her hotline call. When Moore said she felt singled out in her meetings with Hyche, one investigator responded that it was Hyche's job to observe and hold everyone on the team accountable. Moore did not mention race or disability in her hotline calls or her three follow-up discussions with investigators. She also denied needing any workplace accommodations.

SWBT documented Moore's performance in 2017, during which she did not meet satisfactory metrics on her scorecard. From March 24 until her termination date on May 2, 2017,

8

Moore worked a total of four full days and three partial days. SWBT's work log reflects that Hyche met with Moore for an additional coaching session on March 29, 2017, during which Hyche played back call recordings, identified "the things [Moore] [wa]s doing well," and roleplayed practice calls. On March 30, 2017, Moore sent an instant message to Jones, again asking him to move her to another team. On April 3, 2017, Hyche met with Moore and a Union Representative to review the metrics Moore needed to meet and to inform Moore that her DML was being automatically extended to account for the time she had been on non-disciplinary leave.

E.     Moore's Termination

Also on April 3, 2017, an SWBT employee from the Technical Support Feedback Team ("Technical Support"), a different department than Moore's, reported that Moore improperly transferred a customer call instead of placing the requested disconnect order. On April 5, 2017, SWBT conducted an investigatory meeting, during which the recording of the customer call at issue was played and discussed. When asked why she did not accept the call or make a notation in the account, Moore answered that she did not know she was supposed to accept the call since there was no way to save the account and she conceded she made no notation. Hyche explained that one of the reasons for the DML was Moore's failure to meet call expectations. Hyche reviewed with Moore four other instances in which Moore took customer calls but did not make notations, which reflected a failure to provide assistance and make proper notations as required by company policy. Moore confirmed she understood that refusing to take a customer call violated the COBC, that it was a part of her job to handle customer requests to disconnect service, and that she had received additional training after returning from leave. Hyche recommended Moore's employment be terminated. Hyche proceeded to suspend Moore for violating the COBC regarding customer mistreatment and work avoidance pending a "Day in

9

Court" meeting. SWBT's Day in Court is a meeting between the employee, the Union, and management, where the employee can explain why their employment should not be terminated.

Moore, Hyche, Jones, Soliz, and a Union representative participated in Moore's Day in Court meeting on April 26, 2017. Regarding the call flagged by Technical Support, Moore acknowledged that customers requesting to disconnect service did not impact her salary and explained that she only transferred the call at issue because Hyche had instructed her to transfer calls when it was apparent that there was no chance of retention. Moore read aloud a statement she prepared that was addressed to Soliz, who had the sole authority to approve Moore's termination. Moore attributed her poor performance to Hyche's excessive monitoring and threats of discipline for poor performance. Moore stated that Hyche "runs her team on fear, intimidation, and the threat of losing your job," and "[t]hat is why she always has people out [on leave] on stress." Moore said that Hyche had a history of harassment and retaliation in that Hyche had similarly mistreated another former employee, M.D., and many others, and that Hyche's "entire team is scared of her." Moore urged SWBT to inquire further into the complaints against Hyche. Moore also stated that Hyche harassed and retaliated against her after she requested Jones transfer her and that her suspension and proposed termination were a continuation of Hyche's harassment and retaliation.

Following the Day in Court meeting, Soliz terminated Moore's employment on May 2, 2017. SWBT provided a Separation Proposal, which set forth Moore's misconduct, her training on the COBC, the COBC violations, as well as discussions and warnings on similar misconduct. Hyche and Jones signed the Separation Proposal, indicating they recommended and concurred with the termination, respectively. Meanwhile, Jones issued Hyche a Final Written Warning after Moore's Day in Court meeting for improperly instructing employees on call avoidance.

10

F.    Additional Summary-Judgment Evidence

In her response to Respondents' motion for summary judgment, Moore admitted that most of Respondents' Statements of Uncontroverted Material Facts were undisputed. Regarding her claim of disability discrimination, Moore stated that she suffers from major depressive disorder and generalized anxiety, and she alleged that Hyche's harassment exacerbated her condition. In her deposition, Moore asserted she told Jones that Hyche treated African American women particularly badly, which Jones did not recall. Moore described Hyche's harassment as consisting of monitoring Moore all day, including following her into the restroom, and making comments and innuendos toward her. Moore explained that the basis of her racial discrimination claim was that Hyche knew she could not treat white women the same way she treated African American women because white women would protest the treatment, whereas Hyche knew she could get away with being harder on African American women. Moore testified that Hyche "really didn't have a problem with me" but rather harassed all women and named another employee who she said suffered the same treatment. Moore said that approximately half of Hyche's team was African American and half was white. Moore maintained that over half of Hyche's team felt stressed because of work, including employees who were not African American. Moore reported that Hyche also nitpicked the work of two white employees and that Hyche treated two African American employees more favorably than her by not scrutinizing their work as much as hers.

III.   **The Circuit Court's Order of Summary Judgment and Moore's Appeal**

The circuit court heard oral argument on the summary-judgment record. Subsequently, Moore served Hyche with a second request for admissions, to which Hyche did not respond. Moore did not move to supplement the summary-judgment record with additional statements of

11

fact. The circuit court proceeded to grant summary judgment to Respondents on all claims against them.

Moore filed a notice of appeal. This Court dismissed the appeal without prejudice for lack of a final judgment because the judgment did not address the pending claims against Hyche.

In order to resolve the outstanding claims, Moore moved for partial summary judgment against Hyche on the retaliation claim. Respondents opposed Moore's motion, arguing that all of Moore's claims against Hyche were already adjudicated by the summary judgment in favor of Respondents because Hyche was in privity with Respondents when the claims arose and all claims against Hyche were based on Hyche's role as an agent-employee of the employer, SWBT. Respondents suggested the claims and issues presented in Moore's motion were resolved under the doctrines of res judicata and collateral estoppel. Moore did not file a response to Respondents' suggestions in opposition. The circuit court denied Moore's motion for partial summary judgment on the grounds alleged by Respondents. The circuit court proceeded to issue a final judgment in the case in favor of all defendants, including Hyche. Moore now appeals.

### Points on Appeal

Moore raises five points on appeal. Points One, Two, and Three argue the circuit court erred in granting summary judgment on Moore's claims of retaliation, racial discrimination, and disability discrimination, respectively, because the record contained sufficient evidence that Moore's complaints of discrimination, race, and disability were contributing factors to her termination. Point Four maintains the circuit court erred in granting summary judgment on Moore's claims of hostile work environment because the record showed sufficient evidence that Moore's race, disability, and complaints of discrimination were contributing factors to her termination. Lastly, Point Five argues the circuit court erred in granting summary judgment to

Hyche because Moore's claims were not precluded by res judicata or collateral estoppel in that there had been no previous lawsuit involving Hyche.

Standard of Review

We review a circuit court's grant of summary judgment de novo. Green v. Fotoohighiam, 606 S.W.3d 113, 115 (Mo. banc 2020) (quoting Goerlitz v. City of Maryville, 333 S.W.3d 450, 452 (Mo. banc 2011), *abrogated on other grounds by* Glendale Shooting Club, Inc. v. Landolt, 661 S.W.3d 778 (Mo. banc 2023)). We do not review summary judgment for the sufficiency of the evidence; rather, summary judgment is proper when the moving party establishes that there are no genuine issues of material facts and that the movant is entitled to judgment as a matter of law. Id. (quoting Goerlitz, 333 S.W.3d at 452). "A material fact in the context of summary judgment is one from which the right to judgment flows." Id. (quoting Goerlitz, 333 S.W.3d at 453).

We review the summary-judgment record in the light most favorable to the non-moving party, "and that party is entitled to the benefit of all reasonable inferences from the record." Green, 606 S.W.3d at 116 (quoting Goerlitz, 333 S.W.3d at 453). "[F]acts contained in affidavits or otherwise in support of the party's motion are accepted as true unless contradicted by the non-moving party's response to the summary judgment motion." Id. at 115 (quoting Goerlitz, 333 S.W.3d at 452–53). Pursuant to Rule 74.04(c)(2)–(4),[1] "the non-movant must support denials with specific references to discovery, exhibits, or affidavits demonstrating a genuine factual issue for trial." Id. at 116 (internal quotation omitted). "Facts not properly supported under Rule 74.04(c)(2) or (c)(4) are deemed admitted." Id. (internal quotation omitted); see also Loerch v. City of Union Missouri, 643 S.W.3d 597, 602 (Mo. App. E.D. 2022)

_____

[1] All Rule references are to Mo. R. Civ. P. (2021), unless otherwise noted.

(citing Green, 606 S.W.3d at 116 n.5) ("Facts come into the summary judgment record only via the numbered paragraphs and responses required by Rule 74.04(c).").

"We will affirm [the circuit court's grant of summary judgment] if the judgment is proper based on any ground raised in the motion and supported by the accompanying summary judgment record." Loerch, 643 S.W.3d at 602 (internal citation omitted). When the circuit court's order does not state the reasons for its grant of summary judgment, we presume that the decision was based on the grounds raised in the movant's motion. Seymour v. Switzer Tenant LLC, 667 S.W.3d 619, 625 (Mo. App. W.D. 2023) (internal citation omitted).

## Discussion

### I. Point One—Retaliation

In Point One, Moore argues the circuit court erred in granting summary judgment to Respondents on her retaliation claim because sufficient evidence showed her complaints of discrimination were contributing factors to her termination.

Section 213.070(2)[2] of the MHRA governs retaliation claims and "makes it unlawful for an employer '[t]o retaliate or discriminate in any manner against any other person because such person has opposed any practice prohibited by this chapter.'" Shore v. Child.'s Mercy Hosp., 477 S.W.3d 727, 735 (Mo. App. W.D. 2015) (quoting Section 213.070(2)). "To establish a claim for retaliation, the employee must prove: (1) that she complained of discrimination; (2) that the employer took adverse action against her; and (3) that the complaint and the adverse action are causally related." Kerr v. Curators of the Univ. of Mo., 512 S.W.3d 798, 814 (Mo. App. W.D. 2016) (citing Shore, 477 S.W.3d at 735); see also Clark v. AT&T Mobility Servs., L.L.C., 623 S.W.3d 197, 208 (Mo. App. W.D. 2021) (citing Bram v. AT&T Mobility Servs.,

---

[2] All Section references are to RSMo (2016), unless otherwise noted.

LLC, 564 S.W.3d 787, 799 (Mo. App. W.D. 2018)) (noting a retaliation claim requires the plaintiff to show "(1) she complained about discrimination under the MHRA; and (2) as a direct result, she suffered reprisal causing damage").

Regarding the complaint element, "[t]he complaint of discrimination does not have to involve actual discrimination for a retaliation claim to stand." Kerr, 512 S.W.3d at 814 (quoting Shore, 477 S.W.3d at 735). Rather, "as long as a plaintiff had a reasonable, good faith belief that there were grounds for a claim of discrimination or harassment, the success or failure of a retaliation claim is analytically divorced from the merits of the underlying discrimination or harassment claim." Id. (quoting Shore, 477 S.W.3d at 735).

Regarding the causal element, "[a] contributing factor is a condition that 'contributes a share in anything or has a part in producing the effect.'" Jones v. Galaxy 1 Mktg., Inc., 478 S.W.3d 556, 573 (Mo. App. E.D. 2015) (internal quotation omitted).[3] A circuit court properly grants summary judgment on MHRA claims in favor of the employer where the summary-judgment record does not support a reasonable inference that the plaintiff's protected characteristics or activities were a contributing factor in the adverse employment action. Id. at 572–73; see also Clark, 623 S.W.3d at 208 (citing Bram, 564 S.W.3d at 799); Kerr, 512 S.W.3d at 814 (citing Shore, 477 S.W.3d at 735).

Moore's retaliation claim is the primary focus of her appeal. Noting that a retaliation claim does not require an actionable claim of discrimination or harassment to be successful, Moore urges us to reverse on her retaliation claim even if we find that summary judgment was properly granted on her claims of racial discrimination, disability discrimination, and hostile

---

[3] The parties agree this case arises under the pre-amended version of the MHRA, prior to August 28, 2017, such that the applicable standard is contributing factor and not motivating factor. See Clark, 623 S.W.3d at 203 (citing Bram, 564 S.W.3d at 795–96; see also Section 213.101.4, RSMo (Cum. Supp. 2018) (expressly abrogating the contributing-factor standard).

15

work environment. Moore alleges SWBT terminated her employment as retaliation for opposing Hyche's discriminatory conduct. Moore identifies her termination as the sole adverse action underlying her retaliation claim.[4]

The parties dispute whether Moore made the requisite complaint of discrimination. Moore argues her protected activity was complaining of racial discrimination when requesting to be transferred from Hyche's team by telling Jones that Hyche, who is an African American woman, treated African American women like Moore worse than other employees by harassing them through being harder on them. Moore admits that neither Hyche nor any other SWBT supervisor made any comments to Moore that were facially discriminatory. However, disparate treatment of members of a protected class may be indicative of discrimination. Shore, 477 S.W.3d at 732–34. Where, as here, there is no direct evidence of racial discrimination, we assess whether the facts alleged give rise to any reasonable inference that Moore was discriminated against because of her race. See id. at 732.

Moore argues her complaint of discrimination was evident in her conversations with Jones, her three Ethics Hotline calls, and her Day in Court. In each instance, she requested to be transferred from Hyche's team due to Hyche's micromanagement and harassment by way of "excessive[] monitor[ing.]" Moore initially testified that she did not tell anyone at SWBT that she was racially discriminated against, then Moore clarified that she "probably told [Jones] . . . [she] did tell him that . . . [Hyche] treated black people terrible, that's—black women in particular." Jones testified that Moore only complained that Hyche was excessively monitoring her. Moore did not complain to any other SWBT supervisor or investigator that Hyche was

---

[4] Moore alleged various acts of retaliation by Hyche that she did not assert to be adverse employment actions for purposes of her retaliation claim against all defendants, thus those acts will not be considered for such purposes here. See Kerr, 512 S.W.3d at 815 (internal quotation omitted) (noting that we review only the claims made and argued before the circuit court).

16

discriminating against her or harassing her on the basis of race. Prior to her termination, Moore had a Day in Court meeting with Hyche, Jones, a Union representative, and Soliz. Soliz had final approval for her termination. At that meeting, Moore made no reference to any alleged racial discrimination. Rather, Moore reiterated that Hyche closely monitored her and threatened to discipline her for poor performance. Moore stated that Hyche had a history of harassment and retaliation in that Hyche had similarly mistreated another former employee, M.D., and many others. Moore elaborated that Hyche's "entire team is scared of [Hyche]" because Hyche "runs her team on fear, intimidation, and the threat of losing your job," and "[t]hat is why [Hyche] always has people out [on leave] on stress."

In reviewing the circuit court's summary-judgment decision, we grant all favorable inferences in the summary-judgment record to Moore as the non-moving party. Green, 606 S.W.3d at 116 (quoting Goerlitz, 333 S.W.3d at 453). We recognize that complaints of only general mistreatment of employees by supervisors do not amount to complaints of racial discrimination. Clark, 623 S.W.3d at 209. The only evidence that Moore complained to anyone at SWBT about racial discrimination was her testimony that she complained to Jones that Hyche treated African American women particularly terribly. Although Jones denied that Moore complained about anything other than Hyche's excessive monitoring of her work performance, we do not weigh the evidence on summary judgment nor assess its credibility. See City of Arnold v. Ray Dickhaner, LLC, 649 S.W.3d 340, 343 (Mo. App. E.D. 2022) (quoting Brentwood Glass Co., Inc. v. Pal's Glass Serv., Inc., 499 S.W.3d 296, 302 (Mo. banc 2016)). We also do not assess the merits of Moore's underlying claim of discrimination for purposes of her retaliation claim. See Kerr, 512 S.W.3d at 814 (quoting Shore, 477 S.W.3d at 735). However, even were we to find that Moore complained of discrimination for purposes of her retaliation

17

claim, the circuit court nonetheless properly granted summary judgment to Respondents because Moore adduced no evidence of a causal connection between her complaint and her termination. See id.; see also Clark, 623 S.W.3d at 209; Bram, 564 S.W.3d at 799–800.

In particular, Moore put forth no evidence that the supervisor who terminated her employment, Soliz, knew about her complaint of discrimination. See Clark, 623 S.W.3d at 209; Bram, 564 S.W.3d at 799–800; see also Eley v. U.S. Dep't of Veterans Affs., 95 Fed. App'x. 190, 192 (8th Cir. 2004) (internal citations omitted) (noting no causal connection exists where there is no evidence that the plaintiff's complaints of discrimination to the direct supervisor and department supervisor were made known to the decisionmaker who took the adverse employment action). At her Day in Court meeting prior to her termination, Moore did not tell Soliz that Hyche discriminated against her or harassed her on the basis of race, nor did she tell Soliz that she told Jones that Hyche was treating African American women like herself differently. Moore identifies nothing in the record causally connecting Soliz's termination of her employment to her complaint of discrimination. See Clark, 623 S.W.3d at 209; Bram, 564 S.W.3d at 799–800.

Further, SWBT produced affirmative evidence in the record that Moore's employment was not terminated as retaliation for her complaints about Hyche's management. The record contains evidence that SWBT terminated Moore's employment following multiple stages of progressive discipline—a Performance Notice, a Written Reminder, DML, then termination—for violating the company's COBC policies on which Moore was trained, including improper transfers and call avoidance. The final stage of discipline was triggered not by Hyche but by an external-department report from Technical Support stating that Moore had mistreated a customer and avoided work by transferring a call rather than providing disconnect service.

18

Moore maintains that SWBT providing a nondiscriminatory reason for Moore's termination is insufficient to entitle SWBT to summary judgment because, under the pre-amended MHRA, the federal burden-shifting standard is not required as Moore only need prove a discriminatory reason was a *contributing* factor. While Moore is correct that the federal burden-shifting standard does not govern this case, the Supreme Court of Missouri made clear that "[i]n deciding a case under the MHRA, appellate courts are guided by both Missouri law and federal employment discrimination caselaw that is consistent with Missouri law" including the burden-shifting model of proof outlined in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Daugherty v. City of Maryland Heights, 231 S.W.3d 814, 818 (Mo. banc 2007), *overruled by statute*; see, e.g., Medley v. Valentine Radford Commc'ns, Inc., 173 S.W.3d 315, 325 (Mo. App. W.D. 2005) (applying the burden-shifting standard in an MHRA retaliation claim on summary judgment and finding the employer's evidence of a nondiscriminatory reason for the adverse action supported concluding that the plaintiff could not demonstrate that the employer's adverse action was causally related to her discrimination complaint). Here, SWBT's right to judgment as a matter of law does not stem directly from rebutting her claim with documentation of a nondiscriminatory reason for her termination but rather from Moore's failure to produce evidence in the summary-judgment record that there exists a genuine dispute of material fact that her complaint of racial discrimination was a contributing factor to her termination. See Clark, 623 S.W.3d at 209; Bram, 564 S.W.3d at 799–800.

Although Moore alleges the timing of her termination raised the specter of pretextual reasoning, her performance record with SWBT undermines her claim. Moore's complaint of racial discrimination to Jones occurred in either May 2015 or May 2016, but Soliz did not terminate her until May 2017 following four stages of progressive discipline. Moore alleges the

19

timing was suspicious in that she had again asked Jones to transfer her from Hyche's team on March 30, 2017, then Hyche held a disciplinary meeting with her and her Union representative several days later in the beginning of April 2017, and that meeting led to her Day in Court meeting and subsequent termination. The record shows, however, that Technical Support issued its report about Moore's customer call on April 3, 2017, which prompted a meeting about that report. "[A]lthough a causal connection may be proven circumstantially by showing that the discharge followed the protected activity very closely in time, usually 'more than a temporal connection between protected activity and an adverse employment action is required to show a genuine factual issue on retaliation exists.'" Medley, 173 S.W.3d at 325–26 (quoting Buettner v. Arch Coal Sales Co., 216 F.3d 707, 715–16 (8th Cir. 2000)).

Moore has not adduced evidence of a genuine factual dispute in the summary-judgment record that her complaint of discrimination was a contributing factor to her termination.[5] See id.; see also Clark, 623 S.W.3d at 208 (citing Bram, 564 S.W.3d at 799); Kerr, 512 S.W.3d at 814 (quoting Shore, 477 S.W.3d at 735). Accordingly, because the summary-judgment record contained no evidence that Moore's complaint and termination were causally related, SWBT and its employees were entitled to judgment as a matter of law on Moore's retaliation claim. See Clark, 623 S.W.3d at 209; Bram, 564 S.W.3d at 799–800; Kerr, 512 S.W.3d at 814 (citing Shore, 477 S.W.3d at 735); see also Loerch, 643 S.W.3d at 602 (internal citation omitted). Point One is denied.

---

[5] We note that Moore did not incorporate into the summary-judgment record any additional admissions stemming from Hyche's failure to respond to the second request for admissions. See Rule 74.04(c); Loerch, 643 S.W.3d at 602 (citing Green, 606 S.W.3d at 116 n.5) ("Facts come into the summary judgment record only via the numbered paragraphs and responses required by Rule 74.04(c)."); Columbia Mut. Ins. Co. v. Heriford, 518 S.W.3d 234, 240 (Mo. App. S.D. 2017) (internal citation omitted) ("Regardless of what evidentiary material is attached to the parties' statements of facts . . . only those material facts set forth in the parties' statements of facts may be considered in determining whether summary judgment is appropriate.").

## II.    Point Two—Discrimination on the Basis of Race

In Point Two, Moore argues the circuit court erred in granting summary judgment to Respondents because the record contained sufficient evidence that Moore's race was a contributing factor to her termination.

Section 213.055 of the MHRA prohibits employment discrimination on the basis of race. See Jones, 478 S.W.3d at 572 (citing Section 213.055.1(1)(a)). To make a claim of racial discrimination, Moore was required to show: "(1) that she suffered an adverse employment action; (2) that her race was a contributing factor; and (3) that she was damaged as a result." Clark, 623 S.W.3d at 203 (citing Bram, 564 S.W.3d at 796). As noted in our discussion of Moore's retaliation claim, a circuit court properly grants summary judgment to an employer on a claim under the MHRA where the record does not support a reasonable inference that the plaintiff's protected characteristics were a contributing factor in the adverse employment action. Jones, 478 S.W.3d at 572–73; see also Clark, 623 S.W.3d at 208 (citing Bram, 564 S.W.3d at 799); Kerr, 512 S.W.3d at 814 (citing Shore, 477 S.W.3d at 735).

Moore alleges that Hyche treated African American women worse than other employees. Both Moore and Hyche are African American women. When asked to describe the disparate treatment, Moore explained that Hyche knew she could not treat white women the same way she treated African American women because white women would protest the treatment, whereas Hyche knew she could get away with being harder on African American women. At her Day in Court meeting prior to her termination, Moore attributed her poor performance to Hyche's excessive monitoring and unfounded threats of discipline for poor performance. Moore stated that Hyche "runs her team on fear, intimidation, and the threat of losing your job," and "[t]hat is why she always has people out [on leave] on stress." Moore said that Hyche had a history of

21

harassment and retaliation in that Hyche had similarly mistreated another former employee, M.D., and many others, and that Hyche's "entire team is scared of her." Moore also testified about the general makeup and treatment of the employees on Hyche's team. Moore stated that Hyche "really didn't have a problem with me" but rather harassed all women on her team. Moore testified that approximately half of Hyche's team was African American and half was white. Moore asserted that over half of Hyche's team felt stressed because of work, including employees who were not African American. Moore testified that Hyche also nitpicked the work of two white employees and that Hyche treated two African American employees more favorably than her by not scrutinizing their work as much as hers.

Granting Moore all reasonable inferences, we are not persuaded the record shows Hyche discriminated against Moore on the basis of race or that such discrimination was a contributing factor to her termination. See Clark, 623 S.W.3d at 203 (citing Bram, 564 S.W.3d at 796). In her complaints to Jones, three Ethics Hotline calls, and Day in Court statement, Moore consistently complained that Hyche excessively monitored, nitpicked, and controlled her work, including listening to her customer calls and scrutinizing her time. Jones and an Ethics Hotline investigator informed Moore that Hyche was acting properly within her supervisory role by monitoring Moore's work performance, including listening to her customer calls for compliance with the company's COBC policies, with which Moore had ongoing disciplinary issues originating sometimes from Hyche but also from SWBT's routine monitoring and Technical Support, both of which are outside of Hyche's sphere of influence. While we understand the difficult position an employee may be in when he or she has an intolerable supervisor, the employee may seek recourse under the MHRA only if the supervisor's actions are based upon a protected class or activity. By Moore's own admission, Hyche exerted a high degree of control

22

over her entire team, which was comprised of half African American employees and half white employees, everyone on the team feared Hyche, and half of them were caused stressed by her overbearing management. See id. at 209 (noting that complaints of a supervisor's general mistreatment of employees do not amount to complaints of racial discrimination).

Moreover, as we thoroughly discussed in the preceding section, Moore identifies nothing in the record from which to find that racial discrimination was a contributing factor to SWBT's termination of her employment. See Shore, 477 S.W.3d at 734 (finding no evidence in the summary-judgment record of disparate treatment where the plaintiff was terminated as a direct cause and effect of his own behavior). Soliz had the ultimate authority to terminate Moore's employment, and Moore points to no evidence connecting her race to Soliz's action in terminating her employment. Absent race being a contributing factor to her termination, Moore cannot show that summary judgment was improperly granted to Respondents on her claim of racial discrimination. See id. at 735; see also Loerch, 643 S.W.3d at 602 (internal citation omitted). Point Two is denied.

## III.    Point Three—Discrimination on the Basis of Disability

Moore next contends the trial court erred in granting summary judgment to Respondents on her claim of disability discrimination. Specifically, Moore argues the record contained sufficient evidence that her disability of major depressive disorder and generalized anxiety was a contributing factor to her termination.

"The MHRA makes it unlawful for an employer to discharge an individual . . . because of such individual's disability." Kerr, 512 S.W.3d at 811 (citing Section 213.055.1(1)(a)). To make her claim of disability discrimination, Moore must show: "(1) she is legally 'disabled;' (2) she was discharged or discriminated against with respect to her compensation; (3) and that the

23

disability was a factor in the decision to discharge her or in the compensation decision." Id. (citing DeWalt v. Davidson Serv./Air, Inc., 398 S.W.3d 491, 499 (Mo. App. E.D. 2013)).

Section 213.010(4) defines "disability" as a "physical or mental impairment which substantially limits one or more of a person's major life activities, being regarded as having such an impairment, or a record of having such an impairment, which with or without reasonable accommodation does not interfere with performing the job[.]" Section 213.010(4). "Thus, 'to be disabled under the MHRA, a person must have an impairment that limits a major life activity and with or without reasonable accommodation that impairment must not interfere with performing a job.'" Kerr, 512 S.W.3d at 811 (quoting Medley, 173 S.W.3d at 320). Critically, "[a]n employer must make reasonable accommodations to the *known* limitations of a disabled employee . . . including making the facilities accessible and usable and job restructuring or part-time or modified work schedules." Id. (internal quotation omitted).

Moore testified that she had major depressive disorder and generalized anxiety. Moore offered no medical records of diagnoses or treatment relating to these conditions. However, Moore testified that these conditions cause her to lose sleep, have crying spells, and have difficulty concentrating, which she argues shows these medical conditions qualify as a disability under the MHRA. See Section 213.010(4); Medley, 173 S.W.3d at 320. To support her claim that she had a disability under the MHRA at the time SWBT terminated her employment, Moore relies on the Ethics Hotline investigator's notations that Moore opened a disability claim on September 8, 2016, and that Moore told the investigator that she took FMLA leave after her disciplinary DML leave. The record contains nothing further about Moore's reported FMLA leave, and Moore did not recall whether she informed Jones or any other SWBT supervisor that

she took FMLA leave due to her major depressive disorder and generalized anxiety nor even more generally that she took FMLA leave due to stress from working on Hyche's team.

As noted in the preceding sections, a circuit court properly grants summary judgment to an employer on a claim under the MHRA where the record does not support a reasonable inference that the plaintiff's protected characteristics were a contributing factor to the adverse employment action. Jones, 478 S.W.3d at 572–73; Kerr, 512 S.W.3d at 814 (citing Shore, 477 S.W.3d at 735). Here, even were we to find that Moore had a disability under the MHRA when she was employed by SWBT, Moore has not shown that her disability was a contributing factor to her termination. See Kerr, 512 S.W.3d at 814 (finding the plaintiff could not establish that a mental disability was a contributing factor in the employer's decision to terminate her employment because she adduced no evidence in the summary-judgment record that the employer was aware of her mental disability). Even extending all reasonable inferences to Moore's testimony and statements to the hotline investigators, "mere knowledge that the plaintiff had requested time off to deal with stress or depression [i]s insufficient to prove knowledge of a mental disability" for purposes of a claim of disability discrimination. Kerr, 512 S.W.3d at 813 (quoting Doe v. Bd. of Regents of Univ. of Neb., 846 N.W.2d 126, 148 (Neb. 2014)); see also Kobus v. Coll. of St. Scholastica, Inc., 608 F.3d 1034, 1037 n.3 (8th Cir. 2010) ("Like depression, 'stress and anxiety' are conditions with many variations[;] [c]omplaining of stress and anxiety is not enough to put an employer on notice of a serious health condition" for the purposes of FMLA.). The circuit court did not err in granting summary judgment to Respondents on Moore's claim of disability discrimination. See Loerch, 643 S.W.3d at 602 (internal citation omitted). Point Three is denied.

25

## IV. Point Four—Hostile Work Environment

Moore next argues the circuit court erred in granting summary judgment on her claims of a hostile work environment because the record showed sufficient evidence that her race, disability, and complaints of discrimination were contributing factors to her harassment and termination.

To establish claims for hostile work environment, Moore was required to show: (1) she was a member of a group protected under the MHRA; (2) she was subjected to unwelcome harassment; (3) her membership in the protected group was a contributing factor in the harassment; and (4) a term, condition, or privilege of her employment was affected by the harassment. Clark, 623 S.W.3d at 205 (quoting McGaughy v. Laclede Gas Co., 604 S.W.3d 730, 742 (Mo. App. E.D. 2020)). Moore maintains her status as an African American woman was a contributing factor to Hyche harassing her—by disciplining her, threatening to discipline her, and yelling at her—and terminating her employment.

"Discrimination on the basis of race creates a hostile work environment when 'discriminatory conduct either creates an intimidating, hostile, or offensive work environment or has the purpose or effect of unreasonably interfering with an individual's work performance.'" Id. (internal quotation omitted). "The discriminatory harassment affects a term, condition, or privilege of employment when it is 'sufficiently severe or pervasive enough to alter the conditions of the plaintiff's employment and create an abusive working environment.'" Id. (quoting McGaughy, 604 S.W.3d at 748). "[I]n most cases where a hostile working environment is established, 'the discriminatory acts are not of a nature that can be identified individually as significant events; instead, the day-to-day harassment is primarily significant . . . in its *cumulative* effect.'" Id. (quoting McGaughy, 604 S.W.3d at 748).

26

To establish a hostile work environment, "[t]he workplace must be "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe and pervasive." Anderson v. Durham D & M, L.L.C., 606 F.3d 513, 518 (8th Cir. 2010) (internal quotation omitted). "The severity and pervasiveness thresholds are viewed both subjectively as to the effects on the employee and objectively as they would affect a reasonable person." Clark, 623 S.W.3d at 205 (citing McGaughy, 604 S.W.3d at 748). "[T]he objective test for a hostile work environment is only 'generally' or 'largely,' but not always, an issue for a jury to decide." Bracely-Mosley v. Hunter Eng'g Co., 662 S.W.3d 806, 819 (Mo. App. E.D. 2023). The objective test may be resolved by the court on summary judgment. See id. Thus Moore's reliance on McGaughy to support the sufficiency of the evidence of her claim is inapposite, because that case reviewed "whether there was sufficient evidence to submit an issue to the jury" at trial. See McGaughy, 604 S.W.3d at 742. On summary judgment, we consider the totality of the circumstances for whether there exists a genuine dispute of material fact that severe or pervasive racial harassment altered the conditions of employment and created a discriminatorily hostile, abusive work environment. Bracely-Mosley, 662 S.W.3d at 819–20.

Viewed in the light most favorable to her claims, Moore's testimony in the summary-judgment record does not rise to the level of a hostile work environment. [6] In particular, Moore does not show how her membership in a protected group was a contributing factor in her harassment. See Clark, 623 S.W.3d at 205 (quoting McGaughy, 604 S.W.3d at 742). First, we note that Moore did not allege that anyone at SWBT made any comments that were unwelcome

---

[6] Respondents alternatively argue Moore's claim should be denied for falling outside the statute of limitations because the harassing behaviors were all alleged to have occurred before her return to work following leave. See Section 213.075.1 (requiring an employee to file a Charge of Discrimination within 180 days of the alleged unlawful conduct). However, we agree with Moore that her allegations extended to her return-to-work timeframe as she testified that she believed her discipline and termination were part of a pattern of continuing harassment.

based on her race, alleged disability, or alleged protected activities. See Bram, 564 S.W.3d at 798 (finding summary judgment was precluded because the plaintiff presented evidence that her supervisors made repeated derogatory comments about white people, unfairly criticized and yelled at her, denied her training, required her to shoulder additional duties, and denied her specific privileges that African American employees received). Even had Moore alleged any specific racially-charged comments, which she did not, such comments alone would not automatically constitute a hostile work environment. See Rollins v. Missouri Dep't of Conservation, 315 F. Supp. 2d 1011, 1028 (W.D. Mo. 2004) (noting offhand or isolated comments are "insufficient to establish a hostile work environment").

Moore admitted that Hyche, who is the same race as Moore, was tough on *all* employees on her team, including male and white employees. See Barekman v. City of Republic, 232 S.W.3d 675, 680–81 (Mo. App. S.D. 2007) (noting the facts failed to establish that male employees were exposed to disadvantageous conditions of employment to which female employees were not exposed because both male and female employees were exposed to the complained-of conduct). Moore noted that half of Hyche's team, which included employees who were not African American women, took leave for job-induced stress due to Hyche's demanding management style. Moore also testified that Hyche treated some African American employees more favorably than herself. Finally, Moore stated that Hyche "really didn't have a problem with me" but rather harassed all women.

Moore alleged that Hyche targeted her for "nitpicking" and unfounded discipline because she was an African American woman with a disability, but that allegation is speculative and not supported by evidence in the summary-judgment record, which instead suggests Moore was disciplined for objectively poor work performance. See Anderson, 606 F.3d at 519 (quoting

28

Palesch v. Mo. Comm'n on Hum. Rts., 233 F.3d 560, 567–68 (8th Cir. 2000)) (finding a plaintiff's "offer[ing] little more than speculation and conjecture" was insufficient to preclude summary judgment on claim of hostile work environment). While Moore attempts to contrast Hyche's negative evaluation of her work to that issued by Hill, her interim supervisor, Moore had not recalled that Hill was the one who placed her on a PIP to improve her customer survey scores and issued her a disciplinary Performance Notice.

Further, Moore specifically alleged that Hyche created a hostile work environment by listening to her customer calls and threatening discipline for poor performance, but both Jones and the Ethics Hotline investigator informed Moore that call monitoring and progressive discipline were within a supervisor's expected job duties. See Anderson, 606 F.3d at 519 (citing O'Brien v. Dep't of Ag., 532 F.3d 805, 810 (8th Cir. 2008)) (noting increased scrutiny was insufficient on the record to constitute a hostile work environment). The CBA also specifically authorized supervisors to monitor customer service representative's calls. Moore testified that Hyche would take the same breaks as her and monitor her bathroom use, but Moore does not explain how Hyche supervising her time at work constituted racial, disability, or retaliatory harassment. See Fuchs v. Dep't of Revenue, 447 S.W.3d 727, 733–34 (Mo. App. W.D. 2014) (finding summary judgment was precluded on a disability-based hostile-work-environment claim where the plaintiff testified that her supervisor told her to "realize [she is] broken and go on disability," questioned her repeatedly about the length of time she needed to use the restroom and limited the times when she could do so, denied her request for leave to see her doctor, required a doctor's note to permit her to wear tennis shoes, questioned the volume of work she completed, punished her for tardiness, and assigned coworkers to assist her due to her disability). Moore provided only general testimony about Hyche's overbearing behaviors, including yelling out

from her office at Moore and questioning her clothing, but under the objective test we must apply, we cannot glean from Moore's testimony or from other evidence in the record that Hyche's actions amounted to incidents of severe and pervasive harassment. See Bracely-Mosley, 662 S.W.3d at 819–20. "Hostile work environment claims must meet 'demanding' standards and courts are to 'filter out' those complaints concerning the 'ordinary tribulations of the workplace.'" Anderson, 606 F.3d at 519 (quoting Al–Zubaidy v. TEK Indus., Inc., 406 F.3d 1030, 1039 (8th Cir. 2005)); see also M.W. by & though K.W. v. Six Flags St. Louis, LLC, 605 S.W.3d 400, 413 (Mo. App. E.D. 2020) (citing LeGrand v. Area Res. for Cmty. and Hum. Servs., 394 F.3d 1098, 1101 (8th Cir. 2005)) (noting "[m]ore than a few isolated incidents are required" to meet the threshold for actionable hostile work environment).

Viewing Moore's claims in light of Missouri precedent and applicable federal cases, the circuit court did not err in finding Hyche's conduct here was not, as a matter of law, actionable harassment creating a hostile work environment. See M.W., 605 S.W.3d at 413; Clark, 623 S.W.3d at 205 (quoting McGaughy, 604 S.W.3d at 748). Point Four is denied.

## V.     Point Five—Final Judgment as to Hyche

Moore asserts the circuit court erred in granting judgment to Hyche. Specifically, Moore posits that the circuit court could not apply the legal doctrines of res judicata or collateral estoppel to enter final judgment on all claims against Hyche because there had been no previous lawsuit involving Hyche. Moore maintains that the circuit court's judgment did not actually conclude the case with respect to all defendants because Hyche never moved for summary judgment. We agree.

"As a well-established doctrine in Missouri, res judicata bars the reassertion of a cause of action previously adjudicated in a proceeding between the same parties or those in privity with

30

them." Charter Commc'ns Operating, LLC v. SATMAP Inc., 569 S.W.3d 493, 504 (Mo. App.

E.D. 2018) (internal quotation omitted).

> Res judicata, a Latin phrase meaning "a thing adjudicated", prohibits a party from bringing a previously litigated claim. The modern term is "claim preclusion." Claim preclusion also precludes a litigant from bringing, in a subsequent lawsuit, claims that should have been brought in the first suit. As such, the doctrine applies to every point properly belonging to the subject matter of litigation and which the parties, exercising reasonable diligence, might have brought forward at the time.

Id. (quoting Kesterson v. State Farm Fire & Cas. Co., 242 S.W.3d 712, 715–16 (Mo. banc

2008)). "Collateral estoppel, [or] issue preclusion, 'precludes relitigation of an issue previously

decided and incorporated into an earlier judgment.'" Melnuk v. Hillman, 593 S.W.3d 674, 680

(Mo. App. E.D. 2020) (internal quotation omitted). "Res judicata and collateral estoppel apply

to *final* judgments and preclude re-litigation of the claims or issues decided therein in

*subsequent* causes of action." Cornerstone Mortg., Inc. v. Ponzar, 619 S.W.3d 524, 535 (Mo.

App. E.D. 2021) (quoting State ex rel. Koster v. Didion Land Project Ass'n LLC, 469 S.W.3d

914, 918 (Mo. App. E.D. 2015)). "Thus, they have no application . . . to the *interlocutory*

rulings of a trial court in an *ongoing* cause of action." Id. (quoting Koster, 469 S.W.3d at 918).

Here, the issues before the circuit court were contained to a single, ongoing case with an

interlocutory order of summary judgment. Therefore, judgment could not be granted on the basis

of res judicata or collateral estoppel. See Cornerstone, 619 S.W.3d at 535 (quoting Koster, 469

S.W.3d at 918).

Respondents alternatively suggest that res judicata and collateral estoppel were

misnomers for an otherwise properly rendered judgment under the law-of-the-case doctrine.

The law-of-the-case doctrine provides that a previous adjudication within a case

constitutes the law of the case and precludes relitigation of the issue in subsequent proceedings

in the same case on remand from an appellate decision. Walton v. City of Berkeley, 223 S.W.3d

31

126, 128–29 (Mo. banc 2007) (internal quotation omitted); see also Brackney v. Walker, 670 S.W.3d 455, 459 (Mo. App. S.D. 2023) (quoting Am. Eagle Waste Indus., LLC v. St. Louis Cnty., 379 S.W.3d 813, 825 (Mo. banc 2012)). Res judicata and law-of-the-case "are similar, but the latter more aptly fits [where the matter] involves relitigation of an issue within the same pending case" as res judicata requires a final judgment but law-of-the-case does not. Walton, 223 S.W.3d at 128. The law-of-the-case is a discretionary doctrine of policy and judicial economy that is generally applied by the appellate court unless there was a mistaken fact, manifest injustice, or change in the law. Id. at 130 (internal quotation omitted).

We cannot apply the law-of-the-case doctrine to affirm final judgment in favor of Hyche because that doctrine solely applies to matters presented to *and decided by* the appellate court. See Walton, 223 S.W.3d at 128–29 (internal quotation omitted). After the circuit court granted summary judgment on all claims in favor of Respondents, Moore filed a notice of appeal. We dismissed that notice of appeal for lack of a final judgment because claims remained pending as to Hyche. Because our dismissal for lack of a final judgment was not an adjudication on the merits of any claim, the law-of-the-case doctrine is inapplicable. See id.

We will affirm the circuit court's summary judgment if it is proper under any valid theory raised by the parties and supported by the record. See Loerch, 643 S.W.3d at 602 (internal citation omitted); see also Seymour, 667 S.W.3d at 625–26 (internal citation omitted). Here, however, the parties and record offer no legal basis for entry of final judgment as to Hyche. We recognize the peculiar procedural history of this case, in which SWBT initially represented its employee, Hyche, but terminated representation due to her lack of cooperation in the suit. Following thorough discovery and briefing, the circuit court granted summary judgment in favor of SWBT and its employees, Jones and Soliz, on all counts in the Petition, including Moore's

32

retaliation claim. When Moore later moved for partial summary judgment against Hyche on her retaliation claim, the circuit court denied Moore's motion given the record before it.

In her point on appeal, Moore does not specifically challenge the circuit court's *denial* of her motion, but instead challenges the *grant* of summary judgment to Hyche. Regarding the circuit court's denial of Moore's motion, the record established that Hyche, as Moore's supervisor, was in privity with Respondents for the purposes of the retaliation claim and was sued, like Jones and Soliz, in her capacity as an agent-employee of Respondents. Although the MHRA permits holding supervising employees individually liable if all of the elements of the claim are attributed to them, Moore consistently states in her summary-judgment pleadings and on appeal that the adverse action element of her retaliation and discrimination claims was her termination, which was done by *Soliz* and not by Hyche. See Reed v. McDonald's Corp., 363 S.W.3d 134, 139 (Mo. App. E.D. 2012) (noting Section 213.010(7) broadly defines employer to include "any person directly acting in the interest of an employer"). Indeed, in Moore's second request for admissions, which we consider only for purposes of her motion for partial summary judgment, Hyche admitted that she *recommended* Moore's employment be terminated. Moore brought no claims against Hyche in her individual capacity that were distinct from her claims against SWBT in which she alleged Hyche's conduct contributed to *SWBT's* adverse action of terminating Moore's employment. See Kerr, 512 S.W.3d at 815 (citing Shore, 477 S.W.3d at 735) (noting a retaliation claim against an "employer" requires showing that the "employer took adverse action against her"). We discern no reason why the circuit court's conclusions with regard to SWBT and the other SWBT supervisors would not equally apply to the retaliation claim made against Hyche. During the summary-judgment proceedings initiated by Respondents, Moore had the opportunity to incorporate Hyche's lack of response to her first

request for admissions into the summary-judgment record. Additionally, Moore had the opportunity to respond to Respondents' motion and explain to the circuit court why her retaliation claim against Hyche was not resolved by the summary-judgment litigation but declined to do so. In light of Moore's unsuccessful motion for summary judgment against Hyche on her claim for retaliation, we cannot fault the logic of the circuit court in reasoning that Moore would be unable to prevail on her claims against Hyche. Indeed, even on appeal, Moore never argued or presented any judicial authority indicating that Hyche's failure to file her own motion for summary judgment, on its own, necessitated reversal. Nevertheless. we must consider Moore's contention on appeal that the entry of final judgment in favor of Hyche was not procedurally sound.

Critically, *denying* Moore's motion for partial summary judgment against Hyche does not establish grounds for *granting* judgment to the non-movant Hyche on the retaliation claim or any other. See Betts-Lucas v. Hanson, 31 S.W.3d 484, 485 (Mo. App. W.D. 2000) (citing Williams v. Mercantile Bank of St. Louis, 845 S.W.2d 78, 82 (Mo. App. E.D. 1993)). Under Missouri law, a circuit court has no authority to enter summary judgment for a non-moving party when the non-moving party does not file a cross-motion for summary judgment. Id. (citing Williams, 845 S.W.2d at 82) (holding the circuit court did not have authority to enter summary judgment for defendants, even though the circuit court properly denied the plaintiffs' summary-judgment motion, where the defendants did not file cross-motions for summary judgment); see also Bozarth v. Bozarth, 613 S.W.3d 868, 873 (Mo. App. W.D. 2020) (holding that the circuit court erred in entering summary judgment for the father, even though the circuit court denied the mother's summary-judgment motion, where the father did not file a cross-motion for summary judgment). "Rule 74.04 emphasizes that a judgment should be entered if the *moving* party is

34

entitled to a judgment as a matter of law." Betts-Lucas, 31 S.W.3d at 486 (noting that the "moving party" language reflected a deliberate change to the rule, which prior to 1988 authorized entering summary judgment if *any party* was entitled to it as a matter). Rule 74.04 is replete with due-process protections because entry of summary judgment brings finality to a claim, and "[i]t is incumbent upon the parties seeking relief to initiate action through a motion because courts should not act on their own accord." Id. (quoting Williams, 845 S.W.2d at 82). "The denial of a summary-judgment motion means that the case cannot be summarily dismissed, but [instead] may proceed to trial." Bozarth, 613 S.W.3d at 874 (citing Stacy v. Bar Plan Mut. Ins. Co., 522 S.W.3d 914, 918 (Mo. App. E.D. 2017)).

In this case, Hyche was an "empty chair" and did not cross-move for summary judgment against Moore, nor did she join in Respondents' earlier summary-judgment motion. See Cook v. DeSoto Fuels, Inc., 169 S.W.3d 94, 102 (Mo. App. E.D. 2005) (recognizing that a co-defendant may adopt another defendant's motion for summary judgment in the interests of promoting efficiency and judicial economy); see also Henson v. Greyhound Lines, Inc., 257 S.W.3d 627, 629–30 (Mo. App. W.D. 2008) (affirming the circuit court's grant of summary judgment to the employer-defendant but reversing grant of judgment to the employee-defendant, "who inexplicably did not join in [the employer-defendant's] motion for summary judgment" but instead separately moved for judgment on the pleadings on defeated theory that the plaintiff failed to state a legal duty). When the circuit court entered "full and final judgment" in favor of all defendants, we can only conclude the circuit court's intent was to enter a summary-judgment ruling in favor of Hyche on Moore's petition. See Bozarth, 613 S.W.3d at 873. Because the circuit court cannot grant relief in the form of a final summary judgment that was not sought, the circuit court erred in granting final judgment to Hyche. See Betts-Lucas, 31 S.W.2d at 485–86

35

(citing <u>Williams</u>, 845 S.W.2d at 82). Accordingly, we must reverse the circuit court's judgment as to Hyche. <u>See</u> <u>id.</u> Point Five is granted.

Conclusion

The judgment of the circuit court is affirmed as to Respondents, SWBT, Soliz, and Jones. The judgment is reversed as to Hyche. The case is remanded to the circuit court for further proceedings.

_____
KURT S. ODENWALD, Presiding Judge

Michael E. Gardner, J., concurs.
Renée D. Hardin-Tammons, J., concurs.